792 So.2d 392 (2000)
Ex parte Paul J. CRANMAN, as executor of the estate of Matthew Cranman, deceased.
(In re Paul J. Cranman, as executor of the estate of Matthew Cranman, deceased v. David Maxwell, M.D., et al.)
1971903.
Supreme Court of Alabama.
June 16, 2000.
Opinion Modified on Denial of Rehearing November 22, 2000.
*393 Marion F. Walker, Birmingham, for petitioner.
Michael A. Florie and Joseph S. Miller of Starnes & Atchison, L.L.P., Birmingham, for respondents Dr. David Maxwell, Dr. Patricia A. Hubbs, Dr. John Galaznik, and Dr. Joe Bethany (brief on 2d application for rehearing filed by W. Stancil Starnes, Michael A. Florie, and J. Will *394 Axon, Jr., of Starnes & Atchison, L.L.P., Birmingham).
David G. Wirtes, Jr., of Cunningham, Bounds, Yance, Crowder & Brown, L.L.C.; and S. Greg Burge of Heninger, Burge, Vargo & Davis, Birmingham, for amicus curiae Alabama Trial Lawyers Ass'n, in support of the plaintiffs application for rehearing.

On Application for Rehearing
LYONS, Justice.
The opinion of November 24, 1999, is withdrawn and the following is substituted therefor.
Paul J. Cranman, as executor of the estate of his son Matthew Cranman, deceased, was the plaintiff in a medical-malpractice action. He appealed from summary judgments entered in favor of the defendants David Maxwell, M.D.; Patricia A. Hubbs, M.D.; John Galaznik, M.D.; and Joe Bethany, M.D. (hereinafter sometimes referred to collectively as "the physicians"). The Court of Civil Appeals affirmed, holding that the physicians were entitled to discretionary-function immunity. Cranman v. Maxwell, 792 So.2d 386 (Ala.Civ.App.1998). We granted Paul Cranman's petition for certiorari review, and we reverse.

I. Facts
Matthew Cranman was a student at the University of Alabama in 1994. On September 12, 1994, he went to the Russell Student Health Center of the University of Alabama ("the student health center"), complaining of swelling and pressure in the area of his left testicle. Dr. Maxwell examined him, diagnosed epididymitis (an inflammation of the sperm-collecting tubes near the testicles), and prescribed antibiotics and sitz baths. Matthew returned on October 11, 1994, complaining of low-back pain. Dr. Galaznik examined him, diagnosed muscle pain, and prescribed medication. On November 7, 1994, Matthew again went to the student health center, reporting that he had a possible prostate infection. Dr. Maxwell saw him and determined that he had a slightly tender mass effect in the left epididymis; however, a testicular examination was negative. Dr. Maxwell prescribed more antibiotics and instructed Matthew to return in two weeks. Matthew returned on November 29, 1994, reporting mild discomfort in his left testicle. Dr. Bethany examined him, noted a slight enlargement of the testicle, changed his medication, and recommended that he consult a urologist in his hometown during the semester break.
Matthew did not visit the student health center again until August 23, 1995. At that time he complained of a stabbing, burning pain in his left flank. Dr. Maxwell examined him, diagnosed left paralumbar pain, and prescribed medication and physical therapy. Two days later, when Matthew reported for physical therapy, he was examined by Dr. Hubbs, who noted that he was tender along the costal margin, in his left side, and in his flank. Dr. Hubbs thought Matthew had suffered a strain of the chest muscles; she prescribed additional medication, recommended that he try heat or ice, and instructed him to return in a week. When Matthew returned six days later, he reported that he was feeling better, and Dr. Hubbs gave him additional medication. On October 11, 1995, Matthew reported to the student health center with back pain and a flareup of his epididymitis. Dr. Hubbs noted that he had the symptoms of a hydrocele and that he had seen a urologist. She examined him, diagnosed recurrent epididymitis and a back strain, prescribed pain and antibiotic medication and back exercises, and instructed him to return in two weeks if he did not improve. *395 On November 9, 1995, Matthew went to the student health center complaining of nausea, vomiting, and diarrhea. Dr. Maxwell examined him, but Matthew reported no back or testicular pain. On November 17, 1995, Matthew returned, with recurring back pain, and reported that he had been under stress and had not slept for a week. Dr. Hubbs examined him and found that he was experiencing shoulder pain and tightness different from the earlier back pain. She diagnosed upper back and neck strain, prescribed heat and medication, and referred him to physical therapy.
In December 1995, Matthew was diagnosed with testicular cancer. Cancerous cells were found in his lungs and behind his kidneys. His left testicle was surgically removed, and he underwent chemotherapy, radiation, and other cancer treatments.

II. Procedural History
In September 1996, Matthew sued Drs. Maxwell, Hubbs, and Galaznik; the student health center; and others. He alleged that the physicians had negligently or wantonly breached the applicable standard of care in treating him, thereby breaching an implied contract to render medical treatment. In their answer, the physicians asserted the defense of immunity because, they claimed, they were engaged in a discretionary function within the scope of their authority as employees of the University of Alabama. They then moved for a summary judgment on the basis of immunity. Matthew then amended his complaint to add Dr. Bethany as a defendant and to dismiss the student health center.
Matthew Cranman died on November 6, 1997.[1] On December 31, 1997, the trial court entered a summary judgment in favor of Drs. Maxwell, Hubbs, and Galaznik, concluding that they were protected from liability by discretionary-function immunity. On January 8, 1998, Paul Cranman, Matthew's father and executor, was substituted as a plaintiff, pursuant to Rule 25(a), Ala. R. Civ. P. On January 20, 1998, the trial court entered a summary judgment in favor of Dr. Bethany, based upon immunity. The trial court certified the summary judgments as final, pursuant to Rule 54(b), Ala. R. Civ. P. Paul Cranman appealed to this Court, which transferred the case to the Court of Civil Appeals, pursuant to § 12-2-7(6), Ala.Code 1975. In affirming the summary judgments, the Court of Civil Appeals stated, in pertinent part:
"As Matthew did in the trial court, the executor principally argues on appeal that precedents from other states rejecting immunity for state-employed physicians are persuasive and should be followed by Alabama courts. The trial court, while stating that `[Matthew] made a very compelling argument that [the state physicians] should not be entitled to discretionary function immunity because the character of the discretion which they exercised was medical and not governmental,' concluded that `under the current law of the State of Alabama a State-employed physician is entitled to immunity whether he's exercising "medical discretion" or "governmental discretion."' We agree with the trial court that no Alabama opinion has made any distinction, for purposes of tort liability, among the various forms of discretion that may be afforded to public servants in this state. Indeed, Kassen v. Hatley, 887 S.W.2d 4 (Tex.1994), one of the authorities upon which the executor principally relies, describes Alabama as a state in which government medical personnel are immune from tort liability *396 arising from the exercise of discretion in both governmental and medical decisions. 887 S.W.2d at 11 (citing Smith I [Smith v. Arnold, 564 So.2d 873 (Ala. 1990])).
". . . .
"In this case, the state physicians were employed to provide health care to the student population at a state university. Their diagnoses of Matthew's condition and their recommendations as to treatment of that condition called for no less `professional judgment and discretion' than those made by the state-employed physicians in Barnes [v. Dale, 530 So.2d 770 (Ala.1988)], Smith I, and Harper [v. Gremmel, 703 So.2d 346 (Ala. 1997)], or the state-employed trainer in Lennon [v. Petersen, 624 So.2d 171 (Ala. 1993)], and it follows that they are entitled to the same discretionary function immunity that was afforded to the defendants in those cases. Thus, the trial court correctly entered the summary judgment in favor of the state physicians, and we affirm that judgment."
Cranman v. Maxwell, 792 So.2d at 391-92.
Paul Cranman petitioned this Court for certiorari review of the Court of Civil Appeals' decision. He frames the issue presented as "whether the physicians in the rendition of purely medical treatment to an individual are performing a discretionary act as contemplated by caselaw and are legally entitled to officer-agent immunity under the Constitution for the State of Alabama, Art. I, Section 14." The Court granted his petition and consolidated this case with three other cases for oral argument. All of the cases question the continuing validity of the doctrine of immunity for health-care providers in the State service. See Wells v. Storey, 792 So.2d 1034 (Ala.1999); Ex parte Rizk, [Ms. 1970493, Nov.24, 1999] (reh'g pending);[*]Wimpee v. Stella, [Ms. 1971774, Nov. 24, 1999] (reh'g pending).[**]

III. Development of the Doctrine of Immunity
We today reexamine the doctrine of immunity of officers, agents, and employees of the State for torts committed in the course of their performance of their duties.[2]
We begin our discussion with a review of the doctrine of immunity where the issue *397 arises in the context of the immunity available to the State in an action against the State ("State immunity") as opposed to the immunity available to individual defendants sued for actions taken on behalf of the State ("State-agent immunity").[3] In Hutchinson v. Board of Trustees of University of Alabama, 288 Ala. 20, 256 So.2d 281 (1971), this Court traced the history of State immunity in Alabama, using Copeland and Screws, Governmental Responsibility for Tort in Alabama, 13 Ala. L.Rev. 296 (1961), as a rich source of information. Our first Constitution required the Legislature to direct in what manner and in what courts actions could be brought against the State. Art. 6, § 9, Ala. Const. of 1819. The Legislature obliged in the following year with a statute allowing "any claim against the state" to be instituted by petition to the supreme court where two judges would "form a court for the trial of such suit," with provision for trial by jury on demand. Toulmin, Digest of the Laws of Alabama, tit. 61, ch. 28, §§ 8-10 (1823).
In the Constitution of 1865, a change in philosophy first surfaced when the privilege of suing the State was shifted from a matter of right to a matter within the discretion of the Legislature.[4] The 1820 legislation and successor provisions permitting actions against the State remained in effect until their repeal in 1875.[5] The Constitution of 1875 included, for the first time, a provision stating that "the state of Alabama shall never be made defendant in any court of law or equity." Art. I, § 15, Ala. Const. of 1875. Art. I, § 14, Ala. Const. of 1901, contains the same provision.
In the early years of statehood, this Court allowed a county to enjoy immunity from negligence or nonperformance of its duties except when a statute expressly provided otherwise. A city's liability turned on whether the city was performing a corporate, as opposed to a governmental, function.[6] The aforementioned constitutional prohibition of actions against the State dealt only with the State, not cities and counties. The law applicable to cities and counties was outside the sphere of constitutional regulation.[7] The decisional law underpinning immunity of cities was overturned in Jackson v. City of Florence, 294 Ala. 592, 320 So.2d 68 (1975), in face of dissents arguing in favor of deferring to the Legislature for change in the longsettled understanding of municipal liability. *398 294 Ala. at 600-04, 320 So.2d at 75-79. This Court adopted a similar rule allowing actions against counties, in Lorence v. Hospital Bd. of Morgan County, 294 Ala. 614, 320 So.2d 631 (1975), and Cook v. County of St. Clair, 384 So.2d 1 (Ala.1980).
In Hutchinson, supra, this Court addressed whether the State, acting in its proprietary function, was entitled nonetheless to assert its immunity. Answering in the affirmative, the Court spoke as follows:
"The wall of `governmental immunity' is almost invincible, made so by the people through their Constitution as interpreted by this Court. Our cases are clear that the operation of a hospital is a `governmental function,' but even if we should classify the operation of University Hospital as being a `business function,' nevertheless, the State could not be sued."
288 Ala. at 24, 256 So.2d at 284. Today we must decide whether agents of the State sued in their individual capacity are entitled under certain circumstances to similarly sweeping immunity, regardless of how we would classify the activity in which they are engaged.
No counterpart to Art. I, § 14, Ala. Const. of 1901, which declares the State immune from suit, appears in the Constitution of the United States. Also, the United States Constitution has no counterpart to Art. I, § 13, guaranteeing every person a remedy by due process of law for "any injury done ... in his lands, goods, person, or reputation." The immunity of the United States Government is based upon the decisional law of the federal courts, uninfluenced by the presence of provisions comparable to §§ 13 and 14 of the Alabama Constitution of 1901.
"The explanation for the initial acceptance in the United States of the feudal and monarchistic doctrine of sovereign immunity is obscure. In 1821, in Cohens v. Virginia, 19 U.S. (6 Wheat.) 264, 411, 412, 5 L.Ed. 257, Chief Justice Marshall declared that no suit could be commenced or prosecuted against the United States without its consent. On the basis of this and other early cases the rule of tort immunity became firmly established on the procedural ground that the Federal Government could not be sued without its consent. When justifications were offered, they were consistent with the form in which the rule was stated. The explanation most commonly quoted is that of Mr. Justice Holmes, in Kawananakoa v. Polyblank, (1907) 205 U.S. 349, 353, 27 S.Ct. 526, 51 L.Ed. 834: `A sovereign is exempt from suit, not because of any formal conception or obsolete theory, but on the logical and practical ground that there can be no legal right as against the authority that makes the law on which the right depends.' A separate idea of substantive immunity, as distinct from the denial of the right to sue, also appeared in the federal decisions, and in Gibbons v. United States, (1868) 75 U.S. (8 Wall.) 269, 19 L.Ed. 453, it was held that the Government was immune from all liability in tort."
Restatement (Second) of Torts § 895A cmt. a (1977). Over time, the United States Congress, unfettered by constitutional restraints on lawsuits against the United States and not subject to any constitutional guaranty that a person would have the right to a civil action to redress an injury, enacted statutes that allowed the United States Government to be sued in certain circumstances. For example, in 1855 Congress established the Court of Claims to hear contract cases; in 1887, the Tucker Act waived immunity from suit and conferred jurisdiction upon the Court of Claims and the United States district courts to hear claims against the United *399 States relating to the "taking" of property; in 1946, the Federal Tort Claims Act allowed actions against the United States for money damages for torts committed by Government employees and eliminated personal liability of those employees.
Because the source of the immunity from suit enjoyed by the State of Alabama differs from the source of immunity of the United States Government in that the State's immunity is constitutionally based,[8] neither the Alabama Legislature nor this Court has the power to waive the State's immunity from suit.[9] Nor can the Legislature or this Court eliminate the right to a remedy by a civil action against an individual unless our constitution authorizes it to do so.
Copeland and Screws, in their 1961 article, supra, refer to State-agent immunity only in passing, when dealing with the separate concept of governmental immunity.[10] They conclude:
"Sovereign immunity not only protects state agencies and corporations, but officers, agents or employees in their official capacity where the suits [involve] a state obligation. The problem of agency here is one of incongruitythe individual is not liable while acting for the state if the suit directly affects the state treasury, but the agent is liable for torts committed within his authority and cannot escape personal liability through the immunity shield. Since the state `can do no wrong,' any tort committed by an employee is without authority and the employee cannot set up a defense to escape liability that he was acting within his authority."
Copeland & Screws at 307 (emphasis in original) (footnotes omitted).
In England, the doctrine that "the king can do no wrong" came to be accompanied by the concept that his ministers were personally responsible when they acted illegally. Under their authority to create a common law, courts have struggled over the years to develop a meaningful compromise between the two extremes.[11]Restatement (Second) of Torts § 895D, "Public Officers" (1974), codifies this compromise, with its dichotomy between discretionary functions, in regard to which the public officer or employee is immune, and ministerial functions, in regard to which the public officer or employee is personally liable.
In Mitchell v. Forsyth, 472 U.S. 511, 521, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985), the Supreme Court recognized the footings of the doctrine of immunity in considerations of the separation-of-powers doctrine. Art. III, § 43, Ala. Const. of 1901, requires that each of the three separate coequal branches confine its activities to its respective sphere. While we have not heretofore considered the separation-ofpowers doctrine as part of the equation in determining issues of liability of State agents, other jurisdictions have traced the *400 doctrine of State-agent immunity back to the provisions of their respective constitutions mandating separation of powers. See, e.g., Adams v. City of Tenakee Springs, 963 P.2d 1047 (Alaska 1998); Sutton v. Golden Gate Bridge, Highway & Transp. Dist., 68 Cal.App.4th 1149, 81 Cal. Rptr.2d 155 (1998); Department of Health & Rehabilitative Servs. v. B.J.M., 656 So.2d 906 (Fla.1995); Hiers v. City of Barwick, 262 Ga. 129, 414 S.E.2d 647 (1992), superseded by constitutional amendment, as stated in City of Thomaston v. Bridges, 264 Ga. 4, 439 S.E.2d 906 (1994); Ransom v. City of Garden City, 113 Idaho 202, 743 P.2d 70 (1987); Rumbold v. Town of Bureau, 221 Ill.App.3d 222, 581 N.E.2d 809, 163 Ill.Dec. 655 (1991); Wade v. Norfolk & Western Ry., 694 N.E.2d 298 (Ind.App. 1998); Goodman v. City of LeClaire, 587 N.W.2d 232 (Iowa 1998); Hardy v. Bowie, 719 So.2d 1158 (La.App.1998); Christensen v. Mower County, 587 N.W.2d 305 (Minn. Ct.App.1998); Mahan v. New Hampshire Dep't of Admin. Servs., 141 N.H. 747, 693 A.2d 79 (1997); Broadway & 67th St. Corp. v. City of New York, 116 Misc.2d 217, 455 N.Y.S.2d 347 (Sup.Ct.1982), order rev'd, 100 A.D.2d 478, 475 N.Y.S.2d 1 (1984); Moody v. Lane County, 36 Or.App. 231, 584 P.2d 335 (1978); City of Brownsville v. Alvarado, 897 S.W.2d 750 (Tex.1995); Hudson v. Town of East Montpelier, 161 Vt. 168, 638 A.2d 561 (1993).
Soon after the Constitution of 1901 was adopted, this Court, in Elmore v. Fields, 153 Ala. 345, 45 So. 66 (1907), recognized the right of a citizen to sue a State employee for a tort committed in the line of duty. Elmore was the first Alabama case ever to deal with the issue of immunity for State agents sued in their individual capacity for the commission of a tort. The Court recognized no immunity, citing State v. Hill, 54 Ala. 67 (1875), wherein the Court had held that the State could not be liable under the doctrine of respondeat superior for the torts of its agents. The Court in Elmore also cited United States v. Lee, 106 U.S. 196, 1 S.Ct. 240, 27 L.Ed. 171 (1882), wherein the Supreme Court had quoted from Chief Justice Marshall's opinion in Osborn v. Bank of United States, 22 U.S. (9 Wheat.) 738, 842-43, 6 L.Ed. 204 (1824), as follows:
"`[B]ut if the person who is the real principal, the person who is the true source of the mischief, by whose power and for whose advantage it is done, be himself above the law, be exempt from all judicial process, it would be subversive of the best established principles to say that the laws could not afford the same remedies against the agent employed in doing the wrong which they would afford against him could his principal be joined in the suit.'"
106 U.S. at 213. Thus, because the State can do no wrong, its agents, when committing a tort, are not acting within their authority and, therefore, they do not act on behalf of the State. Elmore, 153 Ala. at 351, 45 So. at 67.
Section 13, with its guaranty of a right to a remedy, was applied in J.B. McCrary Co. v. Phillips, 222 Ala. 117, 130 So. 805 (1930), where a contractor argued that a statute granting Jefferson County the authority to build a sewer system also granted immunity to the county and that the county's immunity shielded it from liability. In rejecting this argument, this Court stated that such a construction of the statute would conflict with § 13 of the Constitution.
The Constitution and cases construing it require that we not ignore § 13 in order to protect State agents from suit. However, the vulnerability of State agents to suit, if not constrained, could lead to excessive judicial interference in the affairs of coequal branches of government, contrary to *401 § 43. In Finnell v. Pitts, 222 Ala. 290, 132 So. 2 (1930), a divided Court (4-3) allowed an action in tort to proceed against a State agent. The dissenting opinion of Justice Thomas invoked as an extreme example the problems that would be posed if the majority's holding led to tort actions against the Governor. 222 Ala. at 303, 132 So. at 15.
We cannot ignore precedents such as Elmore, J.B. McCrary Co., and Finnell, clearly recognizing an open door to lawsuits against State agents and written by Justices of this Court who lived, worked, and wrote in an era much closer to the drafting of the Constitution of 1901 than we do. Yet, at the same time, we cannot ignore the strong policy against judicial interference in the affairs of State government as articulated in § 14 and mandated by § 43. Although § 14 is, by its terms, restricted to prohibiting lawsuits against the State, we cannot disregard its impact upon our obligation to observe the constitutional separation of powers. However, we cannot give excessive deference to the authority of the legislative branch, grounded in the separation-of-powers doctrine stated in § 43, to eliminate entirely personal liability of State agents. The authority to exercise the judicial power in § 6.01 of Amendment No. 328 appears after Art. I, § 36.[12] Section 36 erects a firewall between the Declaration of Rights that precedes it and the general powers of government, including the authority to exercise judicial power, that follow it. We must, as far as possible, construe §§ 13, 14, 36, and 43 and § 6.01 of Amendment No. 328 "as a whole and in the light of [the] entire instrument and to harmonize with other provisions." State Docks Comm'n v. State ex rel. Cummings, 227 Ala. 414, 417, 150 So. 345, 346 (1933).
In light of the foregoing constitutional provisions, we conclude that while we have the constitutional power to decide casesthereby applying the law in cases that come before usif the authority conferred upon this Court pursuant to the Judicial Article (Article VI) conflicts with the provisions of § 13, we must construe § 13 as dominant, subject to our obligation to observe the separation of powers established by § 43. In applying the doctrine of separation of powers, we must recognize § 14 as an expression of a strong public policy against the intrusion of the judiciary into the management of the State while, at the same time, acknowledging that it speaks only to a prohibition of lawsuits against the State and does not mention lawsuits against individuals. For this reason, the express provisions of § 13 establishing the right to a remedy through a lawsuit against an individual must, as to the issue before us, stand above the implications from § 14 in the hierarchy within the declaration of rights. In the final analysis, we cannot invoke merely the authority to declare "sound public policy" through caselaw in order to find State agents immune from suit; in order to declare them immune, we must find the immunity in constitutional provisions. This constitutional backdrop enables us to articulate public policy through caselaw in this troublesome area, using constitutional principles, and not simply personal notions of good government, as our compass.
Against this backdrop, we turn to the more recent cases dealing with Stateagent *402 immunity. Seventy-five years after this Court first recognized in Elmore the open door to lawsuits against State agents, this Court decided DeStafney v. University of Alabama, 413 So.2d 391 (Ala.1981). In DeStafney, after recognizing that a claim alleging personal injury caused by the alleged negligent conduct[13] of a State employee, even when that conduct is committed in the line and scope of her employment, is not within the ambit of the constitutional prohibition against lawsuits against the State as expressed in § 14, this Court adopted a rule of qualified immunity derived from Restatement (Second) of Torts § 895D.[14] The adoption of that rule partially closed the door that had been opened in Elmore.
Over the years since this Court decided DeStafney, a case in which an injured child was allowed to sue an employee of a day-care center operated by the University of Alabama, based on the ministerial nature of the employee's duties, the doctrine of State-agent immunity has been applied in a variety of settings. A review of the cases in their factual context illuminates the line the courts of this State have drawn between conduct involved in planning or decision-making in the administration of government[15] and the conduct of those required to carry out the orders of others or to administer the law with little choice as to when, where, how, or under what circumstances their acts are to be done.[16] See the Appendix to this opinion for a compilation of cases from this Court and the Court of Civil Appeals applying the doctrine of State-agent immunity (792 So.2d at 417).
The most difficult applications of the rule derived from the Restatement come in instances where the discretion being exercised has little, if any, bearing on the administration of an agency of government or the execution of duties imposed by law. We cannot insulate State employees acting outside that zone, without disregarding § 13. In Taylor v. Shoemaker, 605 So.2d 828 (Ala.1992), this Court again dealt with the question of qualified immunity and noted the impact of DeStafney on earlier cases:
"The plaintiffs recognize that § 14 of the Constitution of Alabama of 1901 (`the State of Alabama shall never be made a defendant in any court of law or equity') extends immunity to state officers and employees acting within their official capacities, but contend that a tortious act by a state officer or employee removes such an officer or employee from this immunity. They cite Finnell v. Pitts, 222 Ala. 290, 132 So. 2 (1930). By a four-to-three vote, this Court held in that case:
"`We also think that this suit does not violate the constitutional prohibition against suing the state. For though the state cannot be sued (section 14, Constitution), its immunity from suit does not relieve the officers of the state from their responsibility *403 for an illegal trespass or tort on the rights of an individual, even though they act pursuant to authority attempted to be conferred by the state. For when the state officers take private property though they apply it to a public use, a tort has been committed by them. Private property rights have been thereby unlawfully disturbed by them. We believe that the rule is universal that an agent is not excused from personal liability for a tort which he commits for and in the name of his principal, whether the principal is liable to suit or not.
"`The decisions of this court and the authorities generally apply that principle to torts committed by state officers in the name of the state and on account of the state's public affairs. An individual cannot justify a tort on a contention that it is for the state, if the state had no such right. If the state had the right, then its officers, acting by its authority, were justified. The officers cannot be justified upon a mistaken notion of state authority. An inadvertent tort-feasor is such, though he may not be liable to the amount of damages as a willful tort-feasor would be. The question now being discussed is not the extent of liability, but the fact of liability vel non. If in the promotion of the state's business its officers without authority of law apply private property to the state's enterprises, they are guilty of the same nature of wrong, as if they were acting as agents of a private corporation. The wrong is that of the officers personally as well as that of their principal. The officers are sued, not because the state has committed a wrong, but because they personally, though acting as officers, have done so. When a person commits a tort, it is wholly immaterial upon the question of his liability, whether he was acting officially or personally.'
"222 Ala. at 292-93, 132 So. at 4-5. (Citations omitted.)
"The holding by a majority of this Court in Finnell v. Pitts should be read in light of later cases decided by this Court involving the immunity of public officers. The law of this State is that there is immunity when the state officer or employee has not exceeded his or her authority, but has merely negligently performed a statutory duty while acting pursuant to statutory authority. Gill v. Sewell, 356 So.2d 1196 (Ala.1978). Likewise, consistent with Restatement (Second) of Torts, § 895D, "Public Officers" (1974), there is immunity when the state officer or employee commits a tort while engaged in the exercise of a discretionary function. Sellers v. Thompson, 452 So.2d 460 (Ala.1984). Consequently, any statements made in Finnell v. Pitts, supra, and Elmore v. Fields, 153 Ala. 345, 45 So. 66 (1907) (the only Alabama authority on which the majority of this Court relied in Finnell), regarding the application of the qualified immunity defense should be considered in light of these later holdings."
605 So.2d at 829-30. This Court in Taylor noted that the sweep of Finnell had been restricted by DeStafney.
Our more recent cases dealing with the question when conduct constitutes the performance of a discretionary function as opposed to the performance of a ministerial function have used language that suggests a requirement that the actor be involved in "planning tasks" and "policy-level decision-making" in order to qualify for immunity. See Defoor v. Evesque, 694 So.2d 1302, 1305 (Ala.1997), followed in Town of Loxley v. Coleman, 720 So.2d 907 (Ala.1998). Recently, the Court of Civil Appeals referred to conduct that falls under *404 the heading of "ministerial functions" as "characterized by operational tasks and minor decision-making." Kassaw v. Minor, 717 So.2d 382, 385 (Ala.Civ.App.1998). This language in these recent cases could be read as disallowing State-agent immunity in instances where the actor, even though he may be making a complex decision beyond the range of the lay person, is not involved at the time in decision-making that directly relates to the exercise of a governmental-policy judgment.[17]
Under the most elementary elaboration of the DeStafney formulation, conduct related to policy and planning and involving the exercise of judgment carries immunity, while ministerial acts carrying out the commands of decision-makers do not. However, at least two primary problems arise in the application of this test drawn from the American Law Institute's appreciation of prevailing law from around the country.
First, as is the case with liability under the Federal Tort Claims Act, as discussed in Berkovitz v. United States, see note 17, cases from other jurisdictions often draw the line in the context of statutory remedies under which all agents enjoy immunity and therefore the point of demarcation relates only to the extent to which the public coffers will be open. These decisions arising in a context where all agents are immune do not have to reckon with the effect upon the rendition of governmental services if agents are inclined to indecision rather than risk personal liability. However, because we are bound by the aforementioned constitutional provisions, we cannot allow such extraconstitutional considerations to control the outcome.
Second, as long as the agent has not disobeyed clear instructions, almost any challenged conduct can be reduced to the exercise of some degree of judgment or discretion. However, judicial deference to all conduct in which judgment or discretion is employed would exalt the immunity of § 14 over the right to a remedy preserved by § 13. As an example, there should be some recognizable difference in legal consequence between, on the one hand, a prison warden's decision not to fire or not to sanction the entity contracting with the State Department of Corrections to provide medical services and, on the other hand, a decision by the driver of a pickup truck on how to drive through or around potholes while transporting prisoners. Each situation involves judgment or discretion. Under our recent cases, the warden is immune[18] and the truck driver is not.[19]
We cannot, in blind obedience to the doctrine of stare decisis, continue to accept an expansive application of caselaw characterizing as a discretionary function conduct remote from the execution of governmental policy; to do so would perpetuate an erroneous construction of the Constitution. Ex parte Dan Tucker Auto Sales, Inc., 718 So.2d 33, 42 (Ala.1998) (Lyons, J., concurring specially) (citing Gwin, White & Prince, Inc. v. Henneford, 305 U.S. 434, *405 454-55, 59 S.Ct. 325, 83 L.Ed. 272 (1939) (Black, J., dissenting)). The time has come to face the necessity of defining "injury," as that word is used in § 13, in lawsuits against State employees alleging torts committed in the line of duty, in a manner that neither violates § 13 nor prefers § 14 or § 6.01 of the Judicial Article over § 13. We decline to label all discretionary acts by an agent of the State, or all acts by such an agent involving skill or judgment, as "immune" simply because the State has empowered the agent to act. Such an expansive view of the power of the State to act with immunity for its agents would be inconsistent with the rights secured by § 13.

IV. Restatement of the Rule Governing State-agent Immunity
We therefore restate the rule governing State-agent immunity:
A State agent shall be immune from civil liability in his or her personal capacity when the conduct made the basis of the claim against the agent is based upon the agent's
(1) formulating plans, policies, or designs; or
(2) exercising his or her judgment in the administration of a department or agency of government, including, but not limited to, examples such as:
(a) making administrative adjudications;
(b) allocating resources;
(c) negotiating contracts;
(d) hiring, firing, transferring, assigning, or supervising personnel; or
(3) discharging duties imposed on a department or agency by statute, rule, or regulation, insofar as the statute, rule, or regulation prescribes the manner for performing the duties and the State agent performs the duties in that manner; or
(4) exercising judgment in the enforcement of the criminal laws of the State, including, but not limited to, law-enforcement officers' arresting or attempting to arrest persons; or
(5) exercising judgment in the discharge of duties imposed by statute, rule, or regulation in releasing prisoners, counseling or releasing persons of unsound mind, or educating students.
Notwithstanding anything to the contrary in the foregoing statement of the rule, a State agent shall not be immune from civil liability in his or her personal capacity
(1) when the Constitution or laws of the United States, or the Constitution of this State, or laws, rules, or regulations of this State enacted or promulgated for the purpose of regulating the activities of a governmental agency require otherwise; or
(2) when the State agent acts willfully, maliciously, fraudulently, in bad faith, beyond his or her authority, or under a mistaken interpretation of the law.
We today only modify Elmore and cases relying upon it so as to preserve the proper balance between §§ 13, 14, 43, and § 6.01 of the Judicial Article. Our decision today strikes a balance between constitutional provisionsbetween the right to a remedy guaranteed by § 13 and the immunity of the State provided for by § 14; this decision is informed by the wisdom of the doctrine of separation of powers, as considered in light of the presence of § 14, and this decision should prevent Justice Thomas's point made by exaggeration in his dissenting opinion in Finnell from becoming prophecy. The Legislature, should it see fit to do so, can create a mechanism for providing State employees with liability insurance or it can propose a constitutional amendment that would authorize statutory procedures to make the *406 State amenable to lawsuits for the torts of its agents while protecting State employees from lawsuits.

V. Application of the Restated Rule of State-agent Immunity to the Physicians
We now return to the question presented by this case: Whether physicians employed by the University of Alabama to work at the student health center, a facility funded by the State for the purpose of providing readily accessible medical care to students, are entitled to State-agent immunity. The physicians argue that decision-making exercised by a physician in treating a patient should be entitled to immunity because, they say, such decision-making inherently involves the utmost discretion, while the plaintiff Cranman argues that a physician's treatment of a patient is too remote from governmental policy to be entitled to immunity. In response, the physicians argue that governmental policy need not be material to the physician's decision-making because, they say, the business of government is whatever government chooses to do.
We determine the immunity issue pursuant to today's restatement of the rule governing State-agent immunity[20] in light of the constitutional provisions that guide our determination. The conduct of the physicians, in their treatment of Matthew Cranman, does not fit within any category of conduct recognized by the restated rule as immune. The physicians are therefore not entitled to State-agent immunity. Thus, we reverse the judgment of the Court of Civil Appeals and remand the case for further proceedings consistent with this opinion.
APPLICATION GRANTED; OPINION OF NOVEMBER 24, 1999, WITHDRAWN; OPINION SUBSTITUTED; REVERSED AND REMANDED.
HOOPER, C.J., and HOUSTON, J., concur.
JOHNSTONE, J., concurs specially.
COOK, J., concurs in the judgment and concurs in part in the opinion.
BROWN, J., concurs in the judgment.
MADDOX and SEE, JJ., dissent.
ENGLAND, J., recuses himself.
JOHNSTONE, Justice (concurring specially).
I concur, but with the reservation that the Restatement (Second) of Torts § 895D "Public Officers" (1974), and not § 14 or § 43 of the Alabama Constitution of 1901, seems to be the current basis for Alabama's doctrine of State-agent immunity, DeStafney v. University of Alabama, 413 So.2d 391, 393 (Ala.1981), although I recognize that some of our cases, including DeStafney, contain language to the effect that § 14 is, to some extent, the basis. The Restatement of Torts derives principally from the common law and from the public-policy judgments of the legal scholars who have authored the Restatement of Torts in a private capacity and not in the capacity of public officials. This basis of common law and legal scholarship amply supports the re-restatement of the law of Stateagent immunity in this Cranman decision, which is worded to provide a way to distinguish immune conduct from nonimmune conduct with consistent accuracy.
COOK, Justice (concurring in the judgment and concurring in part in the opinion).
I concur in the judgment. I would concur in the opinion but for two concerns. *407 First, because of the holding in this case, it is unnecessary to "restate the rule governing State-agent immunity" (792 So.2d at 405) in the broad, general terms the main opinion uses in its purported restatement. Specifically, that opinion states:
"A state agent shall be immune from civil liability in his or her personal capacity when the conduct made the basis of the claim against the agent is based upon the agent's
"(1) formulating plans, policies, or designs; or
"(2) exercising his or her judgment in the administration of a department or agency of government, including, but not limited to, examples such as:
"(a) making administrative adjudications;
"(b) allocating resources;
"(c) negotiating contracts;
"(d) hiring, firing, transferring, assigning, or supervising personnel; or
"(3) discharging duties imposed on a department or agency by statute, rule, or regulation, insofar as the statute, rule, or regulation prescribes the manner for performing the duties and the State agent performs the duties in that manner; or
"(4) exercising judgment in the enforcement of the criminal laws of the State, including, but not limited to, lawenforcement officers' arresting or attempting to arrest persons; or
"(5) exercising judgment in the discharge of duties imposed by statute, rule, or regulation in releasing prisoners, counseling or releasing persons of unsound mind, or educating students."
792 So.2d at 405 (emphasis in main opinion). Because none of these elements is involved in this case, I regard the statements regarding this "rule" as dicta, and I do not concur in them.
Second, I disagree with much of the discussion in Part III of the main opinion, regarding the "development of the doctrine of immunity." The discussion implies that Alabama's discretionary-function immunity arises out of Ala. Const.1901, § 14. That is not so.
Section 14 "prohibits the State and its agencies from being made defendants in any court of law." Rutledge v. Baldwin County Comm'n, 495 So.2d 49, 51 (Ala. 1986) (emphasis added). This Court has "interpreted § 14 as affording absolute immunity to some State officials, as well as to the State itself." DeStafney v. University of Alabama, 413 So.2d 391, 392 (Ala.1981) (on rehearing) (emphasis added). Thus, where § 14 is applicable, it is an absolute defense to tort liability.
It has long been recognized, however, that not every person or agency infused with some aspect of governance qualifies for § 14 immunity. "State officers and employees, in their official capacities and individually, ... are absolutely immune from suit [only] when the action is, in effect, one against the State." Phillips v. Thomas, 555 So.2d 81, 83 (Ala.1989). "In determining whether an action against a state officer is barred by § 14, the Court considers the nature of the suit or the relief demanded, not the character of the office of the person against whom the suit is brought." Ex parte Carter, 395 So.2d 65, 67-68 (Ala.1980). An action is essentially one against the state "when a result favorable to the plaintiff would directly affect a contract or property right of the State." Id. at 68 (emphasis added). "`[W]hen the action is in essence one for the recovery of money from the state, the state is the real, substantial party in interest and is entitled to invoke its sovereign immunity from suit even though individual officials are nominal defendants.'" DeStafney, 413 So.2d at 393 (quoting Ford *408 Motor Co. v. Department of Treasury of Indiana, 323 U.S. 459, 464, 65 S.Ct. 347, 89 L.Ed. 389 (1945)).
The scope of § 14 is further limited by the fact that it extends only to "the protection of `immediate and strict governmental agencies of the State, as its State Board of Administration, State Docks Commission,... the University of Alabama, the State Insane Hospital, and other mere governmental agencies.'" City of Foley v. Terry, 278 Ala. 30, 34, 175 So.2d 461, 465 (1965) (emphasis added) (quoting Ex parte Board of School Comm'rs of Mobile County, 230 Ala. 304, 305, 161 So. 108, 109 (1935), which concluded that § 14 does not apply to "county and city boards of education").
Where the action is not one against the State, however, this Court has adopted the discretionary-function analysis of the Restatement (Second) of Torts § 895D (1974). DeStafney, supra; Grant v. Davis, 537 So.2d 7 (Ala.1988) (citing DeStafney as the progenitor of Alabama cases applying the Restatement approach); Crowe v. City of Athens, 733 So.2d 447 (Ala.Civ.App.1999) (citing Grant v. Davis as the case adopting the Restatement approach). This Court said in DeStafney:
"Even absent the requisite identity between the State and the state official or employee defendant to invoke absolute immunity, the Restatement's doctrine of substantive immunity may yet be invoked if the official or employee 1) is engaged in the exercise of a discretionary function; 2) is privileged and does not exceed or abuse the privilege; or 3) is not negligent in the performance of his responsibility."
413 So.2d at 395.
Thus, where an action is against a public official and is not, in reality, one against the State, the immunity analysis involves the principles of the Restatementnot § 14. Defoor v. Evesque, 694 So.2d 1302, 1305 (Ala.1997) (Restatement principles apply "[w]hen a State employee is sued for negligence in an action that is not, in effect, an action against the State"). See also Alabama State Docks v. Saxon, 631 So.2d 943, 948 (Ala.1994) ("employees of the State Docks are protected from individual liability only under the doctrine of discretionary function immunity"); Nance v. Matthews, 622 So.2d 297 (Ala.1993).
Admittedly, language in some of our cases suggests that even discretionary-function immunity proceeds from § 14. For example, DeStafney suggested that § 14 "extend[s] a qualified immunity" in such cases. 413 So.2d at 392 (emphasis added); see also Ex parte Kelley, 739 So.2d 1095 (Ala.1999); Pack v. Blankenship, 612 So.2d 399, 403 (Ala.1992) (stating that § 14 also contemplates "qualified immunity," but, nevertheless, using the analysis of the Restatement and the cases applying it). The statement in DeStafney was not followed by any citation of authority, however. Indeed, the contrary proposition was apparent in Ex parte Board of School Commissioners, supra, which directly rejected the contention of the Commissioners that they came "within the protection of section 14." 230 Ala. at 304, 161 So. at 109. In that case, this Court, discussing the immunity afforded to county and city boards of education "from liability for torts of [their] servants or agents," suggested that such immunity flowed from the "broad principle of public policy," rather than from § 14. 230 Ala. at 305, 161 So. at 109.
In fact, DeStafney itself went on to explain that the concept of "qualified immunity... accords with the majority rule with respect to public officials and employees, even in those states that have no comparable constitutional immunity." 413 So.2d at 392 (emphasis added). The Court then proceeded to consider whether *409 the employee of a daycare facility operated by the University of Alabama was entitled to qualified immunity under the principles set forth in the Restatement. 413 So.2d at 393-96.
As a matter of pure logic, the distinction between § 14 and the Restatement is patent and fundamental. If § 14 applies, it matters not whether the challenged conduct of the defendant was discretionary or was ministerial. The official is absolutely immune. In such a case, there is nothing to "weigh" or to "balance." The result is not based on "policy," but on the express prohibition of Alabama's Constitution.
On the other hand, where the action is not one against the State, the immunity analysis is based on considerations of public policy and proceeds upon the general principles of the Restatement. In that case, the existence of immunity turns on whether the conduct of the defendant-official involved the exercise of discretion. Such actions involve a discretionary-function analysis not different in any respect from analyses applied in states that do not have a provision comparable to § 14. Thus, the analysis would be the same if the Alabama Constitution did not contain § 14. Because § 14 is superfluous in such cases, it is disingenuous to suggest that discretionary-function immunity is based on § 14. Although some are confused as to the difference between absolute (§ 14) immunity and discretionary-function (Restatement) immunity, this Court must keep the distinction plainly in view.
In this case, no one contends that the physicians were acting pursuant to any statutory authority, or that they are "state officials" being sued in their official capacities. There is no means by which the University of Alabama, and by extension, the State of Alabama, could be charged with any judgment in favor of Cranman. Thus, § 14 is simply immaterial to this case. Instead, the case involves ordinary discretionary-function immunity, such as is extended to officials in a myriad of roles invested with a public interest. Thus, I disagree with any implication in the main opinion that discretionary-function immunity arises out of § 14.
I agree, however, with the premise of the main opinion that a physician's exercise of discretion in treating a patient at a state university's health clinic is not such conduct that to subject it to liability would violate the doctrine of separation of powers. During oral argument of this case, which was consolidated for oral argument and consideration with three other medical-malpractice actions against State-paid physicians, namely, Wells v. Storey, 792 So.2d 1034 (Ala.1999); Ex parte Rizk, [Ms. 1970493, Nov. 24, 1999];[*] and Wimpee v. Stella, [Ms. 1971774, Nov. 24, 1999],[*] counsel for the plaintiff patients urged this Court to adopt a rule similar to the one set forth in Kassen v. Hatley, 887 S.W.2d 4, 11 (Tex.1994), which recognizes a distinction "between governmental [discretion] and medical discretion." (Emphasis added.)
The rule of Kassen is consistent with, if not identical to, the two-step approach adopted by the United States Supreme Court in Berkovitz v. United States, 486 U.S. 531, 539, 108 S.Ct. 1954, 100 L.Ed.2d 531 (1988) (officials are immune "only [for] conduct that involves the permissible exercise of policy judgment"), modified, United States v. Gaubert, 499 U.S. 315, 325, 111 S.Ct. 1267, 113 L.Ed.2d 335 (1991) (immunity attaches only to those decisions that *410 are "susceptible to policy analysis"), and by a growing number of courts that have held that government-paid physicians are not entitled to immunity from actions alleging a breach of the duty to provide due care to their patients. See, e.g., Lather v. Beadle County, 879 F.2d 365 (8th Cir. 1989); Henderson v. Bluemink, 511 F.2d 399 (D.C.Cir.1974); Keenan v. Plouffe, 267 Ga. 791, 482 S.E.2d 253 (1997); Gould v. O'Bannon, 770 S.W.2d 220 (Ky.1989); Green v. Berrien Gen. Hosp. Auxiliary, 437 Mich. 1, 464 N.W.2d 703 (1990); Womble v. Singing River Hosp., 618 So.2d 1252 (Miss.1993); Frank v. State, 613 P.2d 517 (Utah 1980), modified on other grounds, Hansen v. Salt Lake County, 794 P.2d 838 (Utah 1990); Cooper v. Bowers, 706 S.W.2d 542 (Mo.Ct.App.1986); Comley v. Emanuel Lutheran Charity Bd., 35 Or. App. 465, 582 P.2d 443 (1978); Protic v. Castle Co., 132 Wis.2d 364, 392 N.W.2d 119 (Wis.App.1986); see also Lee v. Bourgeois, 252 Va. 328, 477 S.E.2d 495 (1996); but see Lawhorne v. Harlan, 214 Va. 405, 200 S.E.2d 569 (1973) (intern was entitled to immunity).
On the other hand, "[t]he physicians argue that decision-making exercised by a physician in treating a patient should be entitled to immunity because, they say, such decision-making inherently involves the utmost discretion." 792 So.2d at 406 (emphasis added). The physicians' argument is, in other words, that simply by virtue of their profession they are immune from liability in the practice of that profession. In my view, it is the failure to adopt a Kassen-type rule that would violate the doctrine of separation of powers. Otherwise stated, it is the rule urged by the defendant physicians that would violate that doctrine.
As the main opinion points out, some courts have discussed the doctrine of qualified immunity within the context of the separation-of-powers doctrine. See 792 So.2d at 399-400 (citing cases).[21] The separation-of-powers rationale in the discretionary-function-immunity context is explained as follows:
"`The courts will refrain from secondguessing the legislative and executive branches on issues of basic policy. Under our system of separation of powers, such decisions are vested in the politically responsive coordinate branches. Thus, in applying the test for discretionary function immunity ... we will "isolate those decisions sufficiently sensitive so as to justify judicial abstention."
"`In addition, courts must not intrude into realms of policy exceeding their institutional competence. The judicial branch lacks the fact-finding ability of the legislature, and the special expertise of the executive departments.... [Courts] should not attempt to balance the detailed and competing elements of legislative or executive decisions.'"
Ransom v. City of Garden City, 113 Idaho 202, 205, 743 P.2d 70, 73 (1987) (quoting Industrial Indem. Co. v. State, 669 P.2d 561, 563 (Alaska 1983)).
This rationale rests on two premises. First, there are certain "realms of policy" beyond the judiciary's sphere of "institutional competence," realms into which "courts must not intrude." Id. (emphasis added). Second, the separation-of-powers principle requires deference to the policymakers in the coordinate branches of government as to those matters that involve "issues of basic policy." Id. Neither of these premises supports the proposition *411 that judicial abstention is required or appropriate in a case such as this one.

A. Institutional Competence
As one justification for judicial deference to certain policy-makers, it is said that "[t]he judicial branch lacks the fact-finding ability of the legislature." Ransom, 113 Idaho at 205, 743 P.2d at 73; Helton v. Knox County, 922 S.W.2d 877, 885 (Tenn. 1996); see also Brooks v. Logan, 127 Idaho 484, 903 P.2d 73 (1995). The truth of this assertion, however, is contextual. In some contextssuch as the one involved in this casethe reverse is true. The distinction was recognized in Womble v. Singing River Hospital, 618 So.2d 1252 (Miss.1993), where the application of this premise to "medical personnel ... making treatment decisions" was soundly rejected. 618 So.2d at 1262-63.
Specifically, the Supreme Court of Mississippi explained:
"[T]he judicial system is perfectly capable of adjudicating the reasonableness of medical treatment decisions. Our courts do it every day in medical malpractice actions heard across this state. The medical treatment decisions made by medical personnel at state health institutions are no different from the private medical care decisions that are currently being judged."

Id. at 1264 (emphasis added).
Similarly, the judiciary of Alabama has "special competence to decide discrete cases and controversies involving particular parties and specific facts." Alabama Power Co. v. Citizens of Alabama, 740 So.2d 371, 381 (Ala.1999) (emphasis added). Within that sphere, the institutional competence of the judiciary is supreme.
The standard of care for medical treatment is the same whether the institution employing the treating physician is a public institution or a private one. In other words, physicians are, in either case, obligatedboth legally and morallyto exercise due care in treating their patients. Determining whether that obligation was met in any given case is a matter peculiarly within the prerogative of the judicial branch. The matter is not, in any sense, legislative or executive. Indeed, the only branch with a legitimate role in issues involving a breach of the standard of care owed by a physician to a patient is the judicial branch, acting in its fact-finding role.

B. Deference to Policy-makers
The second premise underlying the separation-of-powers rationale is that it requires deference to the policy-makers of the coordinate branches of government in matters involving the "issues of basic policy." Ransom, 113 Idaho at 205, 743 P.2d at 73. Here again, the legislative and executive branches are uninvolved. This is so, because "there is nothing inherently governmental about decisions regarding individual medical treatment. They do not involve the formulation of public policy in any respect. Therefore, the notion of promoting governmental decisions that are in the public good is completely inapplicable." Womble, 618 So.2d at 1263. Hence, the distinction "between governmental [discretion] and medical discretion." Kassen v. Hatley, 887 S.W.2d at 11 (emphasis added).
"[T]he exercise of medical discretion does not require the same protection as the exercise of governmental discretion. Without immunity, some government officials might hesitate to take actions for the public's protection that could subject them to individual liability." Id. "For example, a police officer might decide not to pursue a suspect. However, a doctor cannot avoid personal liability through inaction because physicians are under a duty to exercise ordinary care to treat patients." Id. (Citation *412 omitted.) Thus, "the threat of suit will not discourage physicians from seeking and accepting government employment, because they will face the exact same potential exposure to liability that they would as private physicians." Womble, 618 So.2d at 1264 (emphasis added). "`The common law of malpractice, as normally applied to private doctors ..., already grants the leeway properly left for expert judgment in the relatively stringent requirements it imposes upon plaintiffs in medical negligence suits. No further leeway is required for the publicly employed doctor ... than for [that doctor's] private counterparts.'" Henderson v. Bluemink, 511 F.2d 399, 402 n. 19 (D.C.Cir.1974) (quoting Spencer v. General Hosp. of District of Columbia, 425 F.2d 479, 489 (D.C.Cir.1969)).
Under this distinction, physicians still enjoy immunity for the exercise of "governmental discretion," that is, decisions establishing governmental policy. Otherwise stated, immunity would attach to such decisions as "require governmental judgment." Gleason v. Beesinger, 708 F.Supp. 157, 159 (S.D.Tex.1989). Examples of such decisions would be those related to the questions "whether a patient is eligible for treatment and whether facilities are available to treat a patient," id. at 162 (citing Costley v. United States, 181 F.2d 723, 724-26 (5th Cir.1950)); and whether "to provide health service, which and how many services to provide, and where and how to provide them." Comley v. Emanuel Lutheran Charity Bd., 35 Or.App. 465, 478, 582 P.2d 443, 450 (1978).
In short, acts involving only "medical discretion" do not implicate the premises underlying the separation-of-powers rationale. I say once again, the only branch of government with a legitimate role in issues involving a breach of the standard of care owed by a physician to a patient is the judicial branch, acting in its constitutional, fact-finding, remedial role. The rule proposed by the plaintiff in this case and the patients in the cases orally argued with this one does not offend that principle; the rule proposed by the defendant physicians does.
This is so, because the separation-ofpowers principle would be offended by a rule that established absolute immunity for State-paid physicians operating within the physician/patient relationship. Such a rule would oust the judiciary of jurisdiction in matters precisely within the sphere of its constitutional prerogative. See Alabama Power Co. v. Citizens of Alabama, supra, 740 So.2d at 381 (judiciary has "special competence to decide discrete cases and controversies involving particular parties and specific facts"). Ifas the defendant physicians urge us to hold physician immunity includes acts of medical-treatment discretion, then, in every conceivable medical-malpractice action against a State-paid physician, once the physician invoked the defense of discretionary-function immunity, the court would have nothing to do but summarily dismiss the physician from the action. Indeed, during oral argument, counsel were unable to hypothesize any credibly foreseeable scenario under which a State-paid physician would not be immune under the immunity rule urged by the physicians in this case.
Simply stated, the rule would leave the judiciary nothing to do in a class of cases committed to it by the constitution. See Ex parte Jenkins, 723 So.2d 649 (Ala. 1998); Broadway v. State, 257 Ala. 414, 60 So.2d 701 (1952) (separation-of-powers principle was violated by a statute that deprived the court of the right to act "judicially" in a certain class of cases); Sanders v. Cabaniss, 43 Ala. 173 (1869). This Court may not, under the guise of a separation-of-powers *413 argument, abdicate its constitutional duty to adjudicate disputes between physicians and their patients alleging medical malpractice. It goes without saying that neither the judicial branch nor either of the other two branches of government may voluntarily abdicate its respective constitutional role. Millcreek Township School Dist. v. County of Erie, 714 A.2d 1095, 1103-04 (Pa. Commw.Ct.1998); Texas Boll Weevil Eradication Foundation, Inc. v. Lewellen, 952 S.W.2d 454, 465 (Tex.1997); Turpen v. Oklahoma Corp. Comm'n, 769 P.2d 1309, 1368 (Okla.1988) (Wilson, J., dissenting). Therefore, this Court cannot, consistent with the separation-of-powers doctrine, declare that it will no longer hear a certain class of cases. Today, the Court quite properly declines the physicians' invitation to do that. Thus, I concur in the judgment and, except as to the two matters discussed above, I agree with the main opinion.
BROWN, Justice (concurring in the judgment).
While the main opinion's attempt to restate generally the law in this area is a worthwhile endeavor, I can concur only in the judgment. I prefer to make at this time no determinations that would reach beyond the issues in the case before us.
MADDOX, Justice (dissenting).
In my opinion, the facts of this case do not require a conclusion different from that reached in Hutchinson v. Board of Trustees of University of Alabama, 288 Ala. 20, 256 So.2d 281 (1971). In that case, I discussed the doctrine of sovereign, or governmental, immunity and its applicability to state agencies and their employees, and wrote: "The wall of `governmental immunity' is almost invincible, made so by the people through their Constitution as interpreted by this Court." Hutchinson, 288 Ala. at 24, 256 So.2d at 283. In my opinion, that statement accurately describes the law of sovereign immunity, which is derived from § 14 of the Alabama Constitution of 1901.
Sovereign immunity has a an undeniable constitutional dimension. For that reason, I wrote the following in Hutchinson:
"We must have a reasonable respect for the doctrine of stare decisis and the division of powers between the Executive, Legislative and Judicial branches of our government. Alabama may one day return to the rule of governmental responsibility with which we began as a State. The frequency of the appeals to this Court asking that the rule be changed is some evidence that the constitutional provision granting governmental immunity may have served whatever purpose it was intended to serve and maybe it should [now] be abandoned. But that is a question addressing itself to the Legislature in initiating and proposing an amendment to the Constitution."
288 Ala. at 24, 256 So.2d at 285. I believe now, as I did when this Court decided Hutchinson, that only a constitutional amendment can disassemble the wall erected by § 14.
My views have not changed since I wrote the opinion in Hutchinson; therefore, I must respectfully dissent.
SEE, Justice (dissenting).
I dissent from the grant of the application for rehearing, from the substituted opinion, and from the judgment. I believe that the defendant State-employed physicians were entitled to discretionary-function (or "State-agent") immunity.
Discretionary-function immunity requires a balancing of the competing policies *414 of the right to a remedy, Art. I, § 13,[22] Ala. Const. of 1901, and sovereign immunity, Art. I, § 14,[23] Ala. Const. of 1901, in light of the separation-of-powers principle of Art. III, § 43,[24] Ala. Const. of 1901.[25] Historically, this balancing was commonly accomplished by determining whether the State-agent's actions were "discretionary" or were "ministerial." See, e.g., Taylor v. Shoemaker, 605 So.2d 828 (Ala.1992); Phillips v. Thomas, 555 So.2d 81 (Ala. 1989); Bell v. Chisom, 421 So.2d 1239 (Ala. 1982); DeStafney v. University of Alabama, 413 So.2d 391 (Ala.1981). The discretionary/ministerial determination is an always significant, and usually dispositive, factor in the balancing test, because the separation-of-powers concerns of § 43 are unlikely to be meaningfully implicated where "ministerial" actions are at issue. That is, when an executive or administrative officer is under a constitutional, statutory, or regulatory duty to perform a specific and definite (that is, "ministerial") act, the judicial branch is not interfering with the executive or legislative power by directing the officer to do what the constitutional provision, statute, or rule plainly directs. In contrast, where the officer is expected to exercise judgment, this Court encroaches on executive or legislative powers when it imposes liability on that officer for his decision, thereby impermissibly affecting the decision-making of a coordinate branch of government. It is for this reason that the discretionary/ministerial determination will dictate whether discretionary-function immunity is available to the State agent or not; that is, unless for some independent reason the interests of one of the two constitutional provisions§ 13 (right to a remedy) or § 14 (sovereign immunity)significantly outweighs the interests of the other.
The original per curiam opinion of November 24, 1999, which is today withdrawn, restated the rule concerning discretionary-function immunity as follows:
"Except where the Constitution or laws of the United States or the Constitution, laws, regulations, or rules of this State enacted or promulgated for the purpose of regulating the activities of a governmental agency require otherwise; or where the governmental agent acts *415 willfully, maliciously, fraudulently, in bad faith, beyond his or her authority, or under a mistaken interpretation of the law, a governmental agent is immune from civil liability where the conduct made the basis of the claim against the agent is based upon the agent's formulation of plans, policies, or designs, or where the agent otherwise makes decisions such as those made in the context of the following activities:
"(1) making administrative adjudications;
"(2) allocating resources;
"(3) negotiating contracts;
"(4) hiring, firing, transferring, assigning, or supervising personnel;
"(5) activities of law-enforcement or correctional officers in arresting, attempting to arrest, or releasing persons;
"(6) all other instances where acts or decisions, including those concerning the safety, health, well-being, fitness, competence, development, or confinement of persons, cannot be challenged without imposing a burden arising from interference with a coequal branch of government that exceeds the benefit of the challenging party's right to a judicial remedy."
I concurred with this statement of the law. In the opinion substituted today on application for rehearing, the rule concerning discretionary-function immunity has been changed to read as follows:
"A State agent shall be immune from civil liability in his or her personal capacity when the conduct made the basis of the claim against the agent is based upon the agent's
"(1) formulating plans, policies, or designs; or
"(2) exercising his or her judgment in the administration of a department or agency of government, including, but not limited to, examples such as:
"(a) making administrative adjudications;
"(b) allocating resources;
"(c) negotiating contracts;
"(d) hiring, firing, transferring, assigning, or supervising personnel; or
"(3) discharging duties imposed on a department or agency by statute, rule, or regulation, insofar as the statute, rule, or regulation prescribes the manner for performing the duties and the State agent performs the duties in that manner; or
"(4) exercising judgment in the enforcement of the criminal laws of the State, including, but not limited to, lawenforcement officers' arresting or attempting to arrest persons; or
"(5) exercising judgment in the discharge of duties imposed by statute, rule, or regulation in releasing prisoners, counseling or releasing persons of unsound mind, or educating students.
"Notwithstanding anything to the contrary in the foregoing statement of the rule, a State agent shall not be immune from civil liability in his or her personal capacity
"(1) when the Constitution or laws of the United States, or the Constitution of this State, or laws, rules, or regulations of this State enacted or promulgated for the purpose of regulating the activities of a governmental agency require otherwise; or
"(2) when the State agent acts willfully, maliciously, fraudulently, in bad faith, beyond his or her authority, or under a mistaken interpretation of the law."
I disagree with the significant and substantial change in the statement of the law given in the substituted opinion. First, the substituted opinion does not "restate" *416 the law of discretionary-function immunity. Instead, it overrules, in part, the law of discretionary-function immunity as it applies to State-employed physicians. The new statement of the law of immunity omits activities by State-employed physicians. This Court has consistently recognized that State-employed physicians and other State-employed health-care providers, in making health-care decisions, typically are engaging in "discretionary" functions, and are therefore ordinarily entitled to immunity from legal liability in regard to those decisions. See Smith v. Arnold, 564 So.2d 873 (Ala.1990); Smith v. King, 615 So.2d 69 (Ala.1993). Indeed, as this Court stated in King, "In Smith v. Arnold,... we recognized that the mental health profession, by its very nature, necessarily involves discretion and difficult decisionmaking." 615 So.2d at 73. Second, the reasoning of the substituted opinion is circular. The substituted opinion omits the activities of State-employed physicians from those activities entitled to sovereign immunity; thus, the main opinion concludes, the defendant physicians are not entitled to State-agent immunity because they "[do] not fit within any category of conduct recognized by the restated rule as immune." 792 So.2d at 406. In the exercise of the judicial power to "say what the law is," Marbury v. Madison, 5 U.S. (1 Cranch) 137, 177, 2 L.Ed. 60 (1803), "to the end that [the government of this state] may be a government of laws and not of men," § 43, Ala. Const. of 1901, this Court's statement of the rule of Stateagent immunity must either, based on precedent, include activities by State-employed physicians or demonstrate why that result is inconsistent with the Constitution of Alabama of 1901.
I would apply the rule as stated in the original per curiam opinion of November 24, 1999, because the balancing of the policies of §§ 13, 14, and 43 of the Constitution of Alabama of 1901 weighs in favor of applying discretionary-function immunity to the physicians in this case. The people of Alabama have chosen to provide opportunities for higher education for the benefit of Alabama citizens. See Ala. Const. of 1901, art. XIV, § 256, amended by amend. no. 111, and § 264, amended by amend. no. 399. To further this effort, the Legislature has authorized the University to provide health-care services for students.[26] See Ala.Code 1975, §§ 16-47-1 and 16-47-2. When State-employed physicians provide health-care services, they perform a public responsibility. The denial of discretionary-function immunity for the performance of these public responsibilities would increase the cost of providing higher educationin the form of the payment of damages awards by the University on behalf of the physicians, or in the form of insurance-premium payments made by the University on behalf of the physicians, or in the form of higher salaries to enable the physicians to purchase their own insurance or to compensate the physicians for their risk of liabilityor it would discourage the University from providing student health services, thereby discouraging students from attending the University. See Taylor v. Shoemaker, 605 So.2d 828, 832 (recognizing that the cost of insurance coverage is an appropriate factor to be considered in determining the applicability of official-function immunity) ("Whether such insurance coverage costs are borne by the officials or by the state, this could have serious ramifications in regard to state *417 budgets and the ability of the state to attract and keep employees.").
Thus, because the State-employed physicians were exercising a discretionary function and because it does not appear in this case that the burden on the plaintiff significantly outweighs the benefits of applying State-agent immunity to the defendant State-employed physicians, the balance of the § 13 and § 14 policies, in light of § 43, favors the application of discretionary-function immunity to these State-employed physicians in the performance of their University-related health-care responsibilities. Accordingly, I dissent from the conclusion of the substituted opinion that the trial court erred in entering the summary judgments in favor of the defendant Stateemployed physicians, and I dissent from the judgment reversing those summary judgments.

APPENDIX TO MAIN OPINION

A Listing of Alabama Cases Discussing the Doctrine of State-Agent Immunity
Bell v. Chisom, 421 So.2d 1239, 1240 (Ala.1982) (State Docks worker could not sue a coemployee); Tutwiler Drug Co. v. City of Birmingham, 418 So.2d 102 (Ala. 1982) (landowner could not sue city official over legislative matter); Deal v. Tannehill Furnace & Foundry Comm'n, 443 So.2d 1213 (Ala.1983) (swimmer injured while diving could not sue members of parks commission); Barnes v. Dale, 530 So.2d 770, 782-84 (Ala.1988) (victim of psychiatric patient could not sue official who allowed patient's release); Grant v. Davis, 537 So.2d 7 (Ala.1988) (person injured because of defect in road could not sue individual responsible for prioritization of road repairs); Phillips v. Thomas, 555 So.2d 81 (Ala.1989) (victim of swimming accident could sue individual who erroneously completed a checklist describing pool as fenced); Smith v. Arnold, 564 So.2d 873 (Ala.1990) (estate of psychiatric patient who committed suicide could not sue consultant); White v. Birchfield, 582 So.2d 1085 (Ala.1991) (victim of motor-vehicle collision could not sue deputy sheriff on basis of injuries caused by deputy's speeding to a crime scene); Point Properties, Inc. v. Anderson, 584 So.2d 1332 (Ala.1991) (landowner denied right to excavate could not sue official in individual capacity over attempt to rescind vacation of a road); Taylor v. Shoemaker, 605 So.2d 828 (Ala. 1992) (automobile-accident victim could not sue individual responsible for decision on whether to apply resources to removal of embedded rails in road); Pack v. Blankenship, 612 So.2d 399 (Ala.1992) (applicant could not sue individual over denial of a sewer permit); Smith v. King, 615 So.2d 69 (Ala.1993) (estate of mental-health inmate who committed suicide could not sue individual who had made subjective assessments about inmate's condition); Nance v. Matthews, 622 So.2d 297 (Ala.1993) (victim of school aide's failure to catheterize recuperating student as she had been instructed to do could not sue the aide's supervisor); Lennon v. Petersen, 624 So.2d 171 (Ala.1993) (victim could not sue coach for failure to recognize an injury soon enough); Hayes v. Walters, 628 So.2d 558 (Ala.1993) (victim of injury in gym class could not sue individual with indirect supervisory duties); Patton v. Black, 646 So.2d 8 (Ala.1994) (claim by student victim of tumbling accident presented jury question as to immunity of teacher); Roden v. Wright, 646 So.2d 605 (Ala.1994) (landowner claiming to be victim of tortious interference could not sue county commissioner over publication of official's opposition to proposed land usage); Lightfoot v. Floyd, 667 So.2d 56 (Ala.1995) (student claiming property improperly seized by Department of Public Safety investigator could sue investigator); *418 Wright v. Wynn, 682 So.2d 1 (Ala.1996) (bystander who attempted to apprehend driver pursued by police officer and was then himself forced to ground and handcuffed by officer could not maintain claim for false imprisonment, but could maintain claim for assault and battery); Defoor v. Evesque, 694 So.2d 1302 (Ala. 1997) (employment applicant taking hydraulics test who slipped on floor at test site could sue employee who had inspected and cleaned the floor); Couch v. City of Sheffield, 708 So.2d 144 (Ala.1998) (arrestee could not sue police officer who arrested him for offense of which he later was acquitted, when officer believed he had probable cause for arrest); Town of Loxley v. Coleman, 720 So.2d 907 (Ala.1998) (inmate who fell from back of pickup truck could sue driver who was trying to avoid potholes in the road as she transported inmates from work site to prison); Ex parte Davis, 721 So.2d 685 (Ala.1998) (mother of inmate who died while in custody of Department of Corrections could not sue warden and assistant warden of prison who did not override treatment decisions of inmate's doctors); Martin v. Harrelson, 532 So.2d 1256 (Ala.Civ.App.1988) (prisoner could sue individual who released his property to third party); McCluskey v. McCraw, 672 So.2d 805 (Ala.Civ.App.1995) (estate of victim of unsafe bridge could not sue engineer and police officer for failure to report condition to county commission); Marnon v. City of Dothan, 677 So.2d 755 (Ala.Civ.App.1995) (terminated employee could not sue officers responsible for termination); Caldwell v. Brogden, 678 So.2d 1148 (Ala.Civ.App.1996) (woman who claimed to have been mistakenly arrested could not maintain 42 U.S.C. § 1983 claim against deputy sheriffs who arrested her and dealt with her while she was in custody); McDuffie v. Roscoe, 679 So.2d 641 (Ala.1996) (estate of person killed as a result of defectively maintained road shoulder could not sue employees of Department of Transportation); Tuscaloosa County v. Henderson, 699 So.2d 1274 (Ala. Civ.App.1997) (arrestee could sue county license inspector who issued arrest warrants for persons whom he could not contact whose names were on list of those who had failed to renew business licenses); Kassaw v. Minor, 717 So.2d 382 (Ala.Civ. App.1998) (student who slipped on hallway floor could sue student employee of college maintenance department who had mopped the floor).
NOTES
[1] The Court of Civil Appeals' opinion states that the record does not indicate whether Matthew Cranman's death was caused by cancer, see 792 So.2d at 389, but the petitioner's brief states that Matthew "died from cancer."
[*] Note from the reporter of decisions: On June 30, 2000, the Supreme Court granted the application for rehearing, withdrew the November 24, 1999, opinion, and substituted a new opinion. The November 24, 1999, opinion carried the judgment line "WRIT GRANTED." The opinion substituted on June 30, 2000, was very different; it carried the judgment line "[REHEARING] APPLICATION GRANTED; OPINION OF NOVEMBER 24, 1999, WITHDRAWN; OPINION SUBSTITUTED; WRIT DENIED."

The substituted Rizk opinion of June 30, 2000, is published at 791 So.2d 911.
[**] Note from the reporter of decisions: On September 1, 2000, the Alabama Supreme Court withdrew its no-opinion affirmance in Wimpee and issued an opinion. The opinion substituted on September 1, 2000, carried the judgment line "[REHEARING] APPLICATION GRANTED; MEMORANDUM OF NOVEMBER 24, 1999, WITHDRAWN; OPINION SUBSTITUTED; REVERSED AND REMANDED."

The substituted Wimpee opinion of September 1, 2000, is published at 791 So.2d 915.
[2] We do not deal here with the absolute immunity of witnesses, judges, prosecutors, and legislators, nor do we overrule Ex parte Purvis, 689 So.2d 794 (Ala.1996). In Mitchell v. Forsyth, 472 U.S. 511, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985), the Supreme Court recognized the absolute immunity of the President of the United States and state and federal legislators and noted the common-law origins of that immunity. Noting that a cabinet official did not enjoy absolute immunity, because of the absence of built-in restraints that are applicable to judges and legislators, the Court wrote:

"[M]ost of the officials who are entitled to absolute immunity from liability for damages are subject to other checks that help to prevent abuses of authority from going unredressed. Legislators are accountable to their constituents, and the judicial process is largely self-correcting: procedural rules, appeals, and the possibility of collateral challenges obviate the need for damages to prevent unjust results."
472 U.S. at 522, 105 S.Ct. 2806 (citation omitted).
[3] We do not include in this opinion any discussion of actions against State officials for injunctive relief to compel performance of duties imposed by law or the Constitution. See Aland v. Graham, 287 Ala. 226, 250 So.2d 677 (1971), recognizing exceptions to Art. I, § 14, in such instances; see, also, Williams v. Hank's Ambulance Serv., Inc., 699 So.2d 1230 (Ala.1997).
[4] Art. I, § 15, Ala. Const. of 1865, repeated in Art. I, § 16, Ala. Const. of 1868.
[5] Ala. Acts 1874-75, No. 200, p. 271. See, also, Ex parte State, 52 Ala. 231 (1875).
[6] Copeland & Screws at 308.
[7] Id.; see also Ex parte Board of School Comm'rs, 230 Ala. 304, 305, 161 So. 108, 109 (1935), noting that city and county boards of education enjoy immunity based "upon the broad principle of public policy," a policy declared by authorities not referring to § 14, but resting upon "the assumption that nothing in the Constitution stood in the way."
[8] Art. I, § 14, Ala. Const. of 1901.
[9] The only statutory basis presently existing for making compensation available to citizens of the State who have suffered injuries caused by the State or its agencies is found in §§ 41-9-60 to -74, Ala.Code 1975, wherein the Legislature established the Board of Adjustment, which functions outside the judicial system. The Legislature, in those Code sections, recognized a moral obligation where there is no legal obligation. Hawkins v. State Board of Adjustment, 242 Ala. 547, 7 So.2d 775 (1942). It extends a measure of compensation or relief when the rule of sovereign immunity exempts the State and its respective agencies from suit. State ex rel. McQueen v. Brandon, 244 Ala. 62, 12 So.2d 319 (1943).
[10] Copeland & Screws at 307.
[11] Restatement (Second) of Torts § 895D, "Public Officers," cmt. a (1974).
[12] "That this enumeration of certain rights shall not impair or deny others retained by the people; and, to guard against any encroachments on the rights herein retained, we declare that everything in this Declaration of Rights is excepted out of the general powers of government, and shall forever remain inviolate." Art. I, § 36, Ala. Const. of 1901 (emphasis added).
[13] State-agent immunity is unavailable where the governmental agent acts willfully, maliciously, fraudulently, in bad faith, beyond his or her authority, or under a mistaken interpretation of the law. See Wright v. Wynn, 682 So.2d 1 (Ala.1996); Barnes v. Dale, 530 So.2d 770 (Ala.1988); Rigby v. Auburn Univ., 448 So.2d 345 (Ala.1984); DeStafney, 413 So.2d at 395; Unzicker v. State, 346 So.2d 931 (Ala. 1977).
[14] DeStafney refers to § 14 as a source of qualified immunity. 413 So.2d at 392. See also Ex parte Kelley, 739 So.2d 1095 (Ala. 1999); Pack v. Blankenship, 612 So.2d 399, 403 (Ala.1992).
[15] Restatement (Second) of Torts § 895D, "Public Officers," cmt. b (1974).
[16] Id., cmt. g.
[17] For an illustration of the concept of protecting "only governmental actions and decisions based on considerations of public policy," as that concept applies to the standards for liability under the Federal Tort Claims Act, see Berkovitz v. United States, 486 U.S. 531, 536-37, 108 S.Ct. 1954, 100 L.Ed.2d 531 (1988). Because all federal employees covered by the Federal Tort Claims Act are immune, the question whether the employee's action or decision is the kind of judgment "that the discretionary function exception was designed to shield" is asked for the purpose of determining the extent of the liability of the United States.
[18] Ex parte Davis, 721 So.2d 685 (Ala.1998).
[19] Town of Loxley v. Coleman, 720 So.2d 907 (Ala.1998).
[20] See Part IV, supra, 792 So.2d at 405.
[*] Note from reporter of decisions: The Rizk and Wimpee opinions of November 24, 1999, were later withdrawn and new opinions were substituted. See reporter's notes to earlier citations to these cases in the main opinion, 792 So.2d at 396.
[21] Notably, none of those cases involved the issue on which this case turns, namely, whether State-paid physicians are entitled to qualified immunity from liability for their alleged failure to exercise due care in treating a patient.
[22] Section 13 provides:

"That all courts shall be open; and that every person, for any injury done him, in his lands, goods, person, or reputation, shall have a remedy by due process of law; and right and justice shall be administered without sale, denial, or delay."
[23] Section 14 provides:

"That the State of Alabama shall never be made a defendant in any court of law or equity."
[24] Section 43 provides:

"In the government of this state, except in the instances in this Constitution hereinafter expressly directed or permitted, the legislative department shall never exercise the executive and judicial powers, or either of them; the executive shall never exercise the legislative and judicial powers, or either of them; the judicial shall never exercise the legislative and executive powers, or either of them; to the end that it may be a government of laws and not of men."
[25] This Court has recognized that the separation-of-powers principle is an appropriate consideration in determining the applicability of discretionary-function immunity. See, e.g., Phillips v. Thomas, 555 So.2d 81, 84 (Ala. 1989) (recognizing that the factors set forth in comment f to Restatement (Second) of Torts, § 895D (1974), including "[t]he extent to which passing judgment on the exercise of discretion by the officer will amount necessarily to passing judgment on the conduct of a coordinate branch of government," should be considered in determining the applicability of discretionary-function immunity); Barnes v. Dale, 530 So.2d 770, 784 (Ala.1988) (same); DeStafney v. University of Alabama, 413 So.2d 391, 394-96 (Ala.1981) (adopting Restatement (Second) of Torts, § 895D (1974)).
[26] Where the Legislature has expressed a view as to the proper balance between the policies of §§ 13 and 14, that determination is due deference; however, the Legislature has not expressed any view as to whether it favors the exercise of immunity in cases like the present one.