Annette L. Key ("Key"), individually and on behalf of her two minor sons, Jeffery P. Parker and Brian Parker (hereinafter together referred to as the "plaintiffs"), sued The City of Cullman (hereinafter the "City"); Lieutenant Max Bartlett (hereinafter "Bartlett"); Compass Bank, Inc.; and The Cullman Times n/k/a APAC-95 Alabama Holdings, Inc. In their complaint, the plaintiffs sought damages for claims alleging negligence, libel, slander, "false light," wrongful intrusion into their privacy, violation of their rights to privacy, and the tort of outrage.[1]
The trial court entered a summary judgment in favor of the City and Bartlett on all of the plaintiffs' claims. On April 30, 2001, the trial court certified that partial summary judgment as final pursuant to Rule 54(b), Ala.R.Civ.P. The plaintiffs appealed, and the Supreme Court of Alabama transferred the appeal to this court, pursuant to § 12-2-7(6), Ala. Code 1975.
A motion for summary judgment is properly granted where no genuine issue of material fact exists and the moving party is entitled to a judgment as a matter of law. Rule 56, Ala.R.Civ.P.; Bussey v. John DeereCo., 531 So.2d 860 (Ala. 1988). After the moving party makes its prima facie showing that there is no genuine issue of material fact, the burden shifts to the nonmoving party to demonstrate the existence of a genuine issue of material fact. Bass v. SouthTrust Bank of Baldwin County,538 So.2d 794 (Ala. 1989). To carry that burden, the nonmoving party is required to present substantial evidence, i.e., "evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved." West v. Founders Life Assurance Co. of Florida, 547 So.2d 870,871 (Ala. 1989). In reviewing a summary judgment, this court must view the evidence in a light most favorable to the nonmoving party, and must resolve all reasonable doubts concerning the existence of a genuine issue of material fact in favor of the nonmovant. Hanners v. Balfour Guthrie,Inc., 564 So.2d 412 (Ala. 1990).
The facts are essentially undisputed. In June 1998, Jennifer Lindley, a college student, reported to the police that a blank check had been stolen from her automobile. On June 2, 1998, that stolen check, containing a forgery of Lindley's signature, was cashed at the main branch of Compass Bank (hereinafter "Compass"); the amount of that forged check was $100.
Also on June 2, 1998, the plaintiffs went to Compass so that Key, who had a Compass Bank checking account, could cash a personal check. Key wrote a check for $100, and the bank teller gave her that amount in cash. Key's two teenaged sons accompanied her while she conducted that banking transaction. While they were in the lobby of the Compass bank, the plaintiffs were videotaped by Compass's surveillance cameras.
On June 30, 1998, a photograph of the plaintiffs taken from the surveillance videotape was published in The Cullman Times, a newspaper of general publication in the community. The caption under the photograph stated, "[t]his bank surveillance photo shows three suspects the Cullman Police Department are looking for in connection with a forgery case." The article, in its entirety, read as follows: *Page 154 
 "Cullman Police Department on Trail of Forgery Suspects.
 "The Cullman Police Department is asking for help in catching a forgery suspect and two possible accomplices.
 "On June 2, two white males and a white female cashed a stolen check at the main branch of Compass Bank.
 "Lt. Max Bartlett of the police department said the checkbook had been reportedly stolen from a vehicle parked at Wallace State Community College.
 "`We feel like they are possibly students,' Bartlett said of the suspects.
 "Anyone with information may call investigation at 734-2868 or CrimeStoppers at 734-7800.
 "Callers to CrimeStoppers do not have to give their name and may receive a reward for information that leads to an arrest and subsequent sentence."
Delores Osborn, the banking center manager for Compass, testified that Compass did not conduct an internal investigation of the forgery because of the amount of the forged check. She testified that "[s]omething this size, meaning small amount, we do not pursue it any further."
Lt. Max Bartlett was the police officer assigned to investigate the forged check. Bartlett testified that he contacted Osborn in his effort to investigate the forgery. Bartlett and Osborn determined from the face of the forged check that the check was cashed in the lobby of the bank on June 2, 1998, at 1:33 p.m., by teller number four. Bartlett then reviewed Compass's surveillance videotape with Linda Owens, the teller-operations coordinator for Compass. Each Compass teller maintains a "teller tape" on which a record of each banking transaction is recorded; Bartlett did not examine the teller tape in the early part of the investigation of the forgery. Bartlett could not make a good identification of the possible suspects from the videotape, and he asked Owens for still photographs of the images from the surveillance videotape. Owens explained to Bartlett that a one-to-two minute variation could exist between the time listed on the surveillance video and the time stamped on the forged check or the teller tape. Therefore, Bartlett requested that Compass provide him photographs developed from the videotape that would depict those people in the bank lobby for the period beginning 10 minutes before the forged check was cashed and ending 10 minutes after that check was cashed, i.e., between 1:23 p.m. and 1:43 p.m.
Owens forwarded Bartlett's request for photographs taken from the surveillance videotape to Kevin Kuykendall, who worked in Compass's security department. Kuykendall used computer technology to obtain photographs from the June 2, 1998, surveillance videotape. The photographs depicted a number of Compass customers who had performed banking transactions during the relevant 20-minute time period. Kuykendall sent the photographs to Owens, and Owens delivered them to Bartlett.
Among the photographs provided to Bartlett were photographs of the plaintiffs; the time recorded on those photographs indicated that the surveillance camera videotaped the plaintiffs at 1:38 p.m. Bartlett testified that although the time at which the photographs of the plaintiffs were taken were outside the one-to-two-minute time variation between the time stamped on the forged check and the time listed on the videotaped surveillance, Key's transaction was "by far the closest" in time to the time stamped on the forged check. Bartlett testified that he did not attempt to compare the teller tape, which contained a list of the account numbers upon which transactions had been conducted, to the surveillance videotape in order to *Page 155 
determine which Compass customers had conducted transactions and were depicted on the videotape.
Bartlett testified that after he reviewed the photographs taken from the June 2, 1998, surveillance videotape, he asked Owens and Osborn whether they could identify the people in the photographs taken from the surveillance videotape, but they could not. After reviewing those photographs, Bartlett concluded that no one was at teller position number 4 at 1:33 p.m., the time the forged check was cashed. However, a photograph in the record depicts a man conducting a transaction at 1:33 p.m. That photograph does not state at which teller position the man was located, but the photograph demonstrates that the man was at the same teller position depicted in the photograph of the plaintiffs. Bartlett determined that the plaintiffs were the persons who had conducted a banking transaction closest in time to the 1:33 time stamped on the forged check. Therefore, he testified, he concluded that the plaintiffs were "strong suspects" in the forgery investigation.
In his deposition, Bartlett acknowledged that the difference in the time the plaintiffs appeared on the surveillance videotape and the time stamped on the forged check was substantial. He also testified that he knew that people who were not involved in the forgery were depicted on the surveillance videotape; that it was possible that the plaintiffs might be Compass Bank account holders conducting a legitimate banking transaction; and that the plaintiffs might not have been the parties who cashed the forged check.
Bartlett testified that after he concluded that the plaintiffs were "strong suspects" in the forgery, he asked Beth Lakey, a reporter at TheCullman Times, to run an article about the forgery, together with a photograph of the plaintiffs, in the "Crimestoppers" section of TheCullman Times. Bartlett testified that he requested that Lakey publish the photograph of the plaintiffs as an attempt to identify the people in that photograph. Bartlett and Lakey each testified that Bartlett told Lakey that the plaintiffs were suspects in the forgery investigation. Bartlett testified that Lakey authored the article that appeared in TheCullman Times; that article identified the plaintiffs as suspects in the forgery.
After the article appeared in The Cullman Times, someone identified Key from the photograph taken from the surveillance video and notified Bartlett of Key's identity. Bartlett testified that he interviewed Key and that their conversation lasted approximately 10 minutes. Bartlett stated that Key denied that she had committed the forgery, and that Key gave him her checking account number so that he could verify that she was conducting a transaction on her own account when she was videotaped by the surveillance camera. Bartlett then obtained a subpoena for the teller tape that reflected transactions occurring at or close to the time of the forgery. The teller tape indicated that Key's transaction took place "in a different location, [at] a different time" than that of the forgery of the check.
Several of the plaintiffs' acquaintances recognized them from the photograph in the June 30, 1998, newspaper article. At Key's request, TheCullman Times printed a retraction of the June 30, 1998, "Crimestoppers" article.
On appeal, the plaintiffs argue that the trial court erred in entering a summary judgment for Bartlett and the City. The City and Bartlett argued in their motion for a summary judgment that they both were entitled to immunity from the prosecution of this action. We first address the *Page 156 
issue whether Bartlett was immune from liability in this action.
The plaintiffs' complaint does not specify whether they sued Bartlett in his official capacity, in his individual capacity, or in both capacities. However, a complaint seeking money damages from a State employee or an agent of the State amounts to a complaint against the State; Art. I, § 14, Alabama Constitution of 1901, bars such a complaint. Ex parte Tuscaloosa County, 796 So.2d 1100 (Ala. 2000); Exparte Butts, 775 So.2d 173, 177 (Ala. 2000). Thus, the plaintiffs may not maintain a cause of action against Bartlett in his official capacity.
Therefore, we assume the plaintiffs' claims were asserted against Bartlett in his individual capacity. A law-enforcement officer, including a municipal police officer, is entitled to immunity from suit for individual tort liability arising out of the performance of any discretionary function of his job. § 6-5-338, Ala. Code 1975. Section6-5-338, Ala. Code 1975, provides in relevant part:
 "(a) Every peace officer, except constables, who is employed or appointed pursuant to the Constitution or statutes of this state, whether appointed or employed as such peace officer by the state or a county or municipality thereof, or by an agency or institution, corporate or otherwise, created pursuant to the Constitution or laws of this state and authorized by the Constitution or laws to appoint or employ police officers or other peace officers, and whose duties prescribed by law, or by the lawful terms of their employment or appointment, include the enforcement of, or the investigation and reporting of violations of, the criminal laws of this state, and who is empowered by the laws of this state to execute warrants, to arrest and to take into custody persons who violate, or who are lawfully charged by warrant, indictment, or other lawful process, with violations of, the criminal laws of this state, shall at all times be deemed to be officers of this state, and as such shall have immunity from tort liability arising out of his or her conduct in performance of any discretionary function within the line and scope of his or her law enforcement duties."
Our supreme court recently adopted a test for evaluating whether a state employee who is sued in his individual capacity is entitled to immunity as an agent of the State. In Ex parte Butts, supra, the court adopted the following test, which was first set forth in its plurality opinion in Ex parte Cranman, 792 So.2d 392 (Ala. 2000):
 "`A State agent shall be immune from civil liability in his or her personal capacity when the conduct made the basis of the claim against the agent is based upon the agent's
"`(1) formulating plans, policies, or designs; or
 "`(2) exercising his or her judgment in the administration of a department or agency of government, including, but not limited to, examples such as:
"`(a) making administrative adjudications;
"`(b) allocating resources;
"`(c) negotiating contracts;
 "`(d) hiring, firing, transferring, assigning, or supervising personnel; or
 "`(3) discharging duties imposed on a department or agency by statute, rule, or regulation, insofar as the statute, rule, or regulation prescribes the manner for performing the duties and the State agent performs the duties in that manner; or
 "`(4) exercising judgment in the enforcement of the criminal laws of the *Page 157 
 State, including, but not limited to, law-enforcement officers' arresting or attempting to arrest persons; or
 "`(5) exercising judgment in the discharge of duties imposed by statute, rule, or regulation in releasing prisoners, counseling or releasing persons of unsound mind, or educating students.
 "`Notwithstanding anything to the contrary in the foregoing statement of the rule, a State agent shall not be immune from civil liability in his or her personal capacity
 "`(1) when the Constitution or laws of the United States, or the Constitution of this State, or laws, rules, or regulations of this State enacted or promulgated for the purpose of regulating the activities of a governmental agency require otherwise; or
 "`(2) when the State agent acts willfully, maliciously, fraudulently, in bad faith, beyond his or her authority, or under a mistaken interpretation of the law.'"
Ex parte Butts, 775 So.2d at 177-78 (quoting Ex parte Cranman, 792 So.2d at 405).
Bartlett's investigation of the forgery constituted a situation in which an agent of the State was "exercising judgment in the enforcement of the criminal laws of the State." See Ex parte Butts, 775 So.2d at 178. The plaintiffs, acknowledging that a police investigation generally involves the exercise of discretion, do not argue that Bartlett is not immune from suit under the general provisions of the above-quoted test for State-agent immunity. The plaintiffs argue instead that Bartlett is not entitled to immunity as an agent of the State under § 6-5-338
because, they say, his conduct was willful and malicious, and, therefore, outside the scope of the immunity afforded a State agent. SeeEx parte Butts, supra.
In Ex parte Tuscaloosa County, supra, Tinsley, a county license inspector, had the authority to institute criminal proceedings against individuals who had obtained business licenses but who had failed to properly renew those licenses. Tinsley obtained an arrest warrant against Cosby for his failure to properly renew his business license; in obtaining that arrest warrant, Tinsley failed to investigate whether Cosby was actually conducting business without a license. In fact, Cosby had ceased conducting the business for which he had had a proper license, and, because he did not intend to continue the business, he did not renew his business license. Cosby learned of the arrest warrant and turned himself in to the police; he was allowed to post bond and did not spend any time in jail. Tinsley later dismissed the charges against Cosby. Cosby sued Tinsley; Cosby alleged that Tinsley was not entitled to immunity as an agent of the state because, he contended, Tinsley acted "willfully, fraudulently, in bad faith, beyond his . . . authority, or under a mistaken interpretation of the law." See Ex parte Butts, 775 So.2d at 178 (quoting Ex parte Cranman). The jury returned a verdict in favor of Cosby on his malicious-prosecution claim. This court affirmed, without opinion, the trial court's judgment entered on that jury verdict. Our supreme court reversed. The court noted that malice was an essential element of a malicious-prosecution claim and held that there was no evidence that Tinsley acted with malice or "personal ill will" toward Cosby. Ex parte Tuscaloosa County, supra, 796 So.2d at 1107.
Similarly, the record contains no evidence indicating that Bartlett acted with malice or "personal ill will" toward the plaintiffs in investigating the forgery. Bartlett asked that Lakey write a "Crimestoppers" article about the forgery; he did not publish that article himself. Also, Bartlett testified that he did not intend to injure or to wrongly accuse the plaintiffs of *Page 158 
the forgery. Both Bartlett and Lakey testified that Bartlett informed Lakey that the people pictured in the photograph taken from the surveillance videotape were "suspects" in the forgery, and that Bartlett wanted the photograph published in the newspaper in order to identify the people in the photograph.
The plaintiffs argue that Bartlett should have used the account numbers on the teller tape to contact each person who had conducted a banking transaction in the Compass bank lobby on June 2, 1998, and ask those people to explain their presence in the Compass lobby. The questions whether a better method of identifying suspects was available to Bartlett and whether the manner in which Bartlett conducted his investigation was negligent or even reckless are debatable. However, those matters are within the discretion afforded the investigator of a crime, and, therefore, they fall within the immunity provided by State-agent immunity for discretionary acts. See § 6-5-338, Ala. Code 1975; Ex parteButts, supra.
The plaintiffs seek to have this court "infer" malice on the part of Bartlett because he did not conduct his investigation of the forgery in the manner they have advocated in their brief on appeal he should have. In making this argument, the plaintiffs characterize Bartlett as the person who identified them as perpetrators of the crime Bartlett was investigating; however, the evidence in the record does not support that assertion. Given the evidence in the record on appeal and our supreme court's holding in Ex parte Tuscaloosa County, supra, we cannot infer that Bartlett acted with malice toward the plaintiffs.
We conclude that the plaintiffs failed to present substantial evidence that would support an inference that Bartlett's actions with regard to his investigation of the forgery were willful or malicious. See West v.Founders Life Assurance Co. of Florida, supra. Therefore, we affirm the trial court's summary judgment in favor of Bartlett.
The plaintiffs also argue that the City is not entitled to immunity from liability under the theory of State-agent immunity. In Ex parte Cityof Montgomery, 758 So.2d 565 (Ala. 1999), D.P. Griffin, a police officer, arrested Christopher Luckie on charges of driving under the influence of alcohol. Luckie sued Griffin with regard to that arrest; Luckie also sued Griffin's employer, the City of Montgomery. The trial court entered a summary judgment in favor of the defendants; this court reversed that summary judgment. Our supreme court reversed this court's judgment, holding that the trial court's summary judgment was proper. The supreme court determined that Griffin's arresting Luckie was an act within his discretion as a law-enforcement officer. The court concluded Griffin was entitled to discretionary-function immunity under §6-5-338, Ala. Code 1975, and, therefore, that the City of Montgomery was also immune under § 6-5-338. Ex parte City of Montgomery, 758 So.2d at 570.
In this case, the plaintiffs sued the City of Cullman for the acts of its police officer, Bartlett. However, because we have concluded that Bartlett was entitled to immunity under § 6-5-338 as an agent of the State, we must hold that the City of Cullman is also entitled to that immunity. Ex parte City of Montgomery, supra.
Because we find that Bartlett and the City of Cullman are entitled to immunity under § 6-5-338, we need not reach the remaining issues raised in the plaintiffs' brief on appeal.
AFFIRMED. *Page 159 
Yates, P.J., and Crawley and Pittman, JJ., concur.
Murdock, J., concurs in the result.
[1] The plaintiffs filed a proper statement of their claims for damages with the City's clerk, as required by § 11-47-23, Ala. Code 1975.