PER CURIAM.
The Utilities Board of the City of Foley, Alabama, d/b/a Riviera Utilities ("Riviera Utilities"), and Tom DeBell, James Wallace, Kevin Saucier, and Roby Tomlin (those individuals are hereinafter collectively *1276 referred to as "the Riviera employees") are the defendants in a personal-injury action filed by Charles D. Hilburn, Jr., and his wife, Christa Hilburn, that is pending in the Baldwin Circuit Court. Riviera Utilities and the Riviera employees petition this Court for a writ of mandamus directing the Baldwin Circuit Court to vacate its order denying their motion for a summary judgment as to the claims filed against them by the Hilburns and to enter a summary judgment in their favor. As to the Riviera employees, we grant the petition and issue the writ. As to Riviera Utilities, we deny the petition.
I. Facts and Procedural History
Riviera Utilities is a legislatively created municipal utilities board and a public corporation under the provisions of Act No. 175 adopted at the 1951 regular session of the legislature, as amended (now codified as § 11-50-310 et seq., Ala. Code 1975 ). Riviera Utilities provides electrical, water, wastewater-treatment, natural-gas, and TV-cable services within the corporate limits of the City of Foley. It also provides electrical and other services to other areas of Baldwin County.
On July 22, 2014, Riviera Utilities was one of eight Baldwin County entities that received an "811 ticket," also known as a line-locate ticket, through a computer program known as "KorWeb." Anyone planning to begin excavation is required by statute to give notice to a utility or a one-call-notification center before beginning the excavation work. Alabama 811 is the one-call-notification center for Alabama, commonly known as the "Call Before You Dig" program. Once it receives a call, Alabama 811 electronically notifies its members that have underground utilities, by means of an 811 ticket, about excavation work to be performed so they can mark those utilities before excavation begins. Riviera Utilities employs personnel known as "line-locate technicians," whose job it is to locate and mark underground lines at excavation sites. Riviera Utilities received approximately 16,000 line-locate calls through the Alabama 811 system in 2014, approximately 20,000 in 2015, and approximately 50,000 in 2016. In the early months of 2017, Riviera Utilities received approximately 9,500 line-locate calls through the Alabama 811 system.
The 811 ticket Riviera Utilities received on July 22 stated that "bridge construction" would take place on Baldwin County Road 52 in Robertsdale. Gulf Equipment Corporation was in charge of a bridge-repair project on County Road 52 pursuant to a contract between Gulf Equipment and the Baldwin County Highway Department calling for repairs to an existing box culvert, which is similar to a storm-drain pipe. The construction site was not within the corporate limits of the City of Foley. Riviera Utilities owned, operated, and maintained power lines in the area where the bridge was being repaired; however, Riviera Utilities was not a party to the bridge-repair contract. The power poles near the bridge-repair project contained several power lines. The top three lines on those power poles are 46-KV lines leased by Alabama Power Company; the bottom lines are Riviera Utilities' 7200-KV primary lines.
Kris Deese, a line-locate technician employed by Riviera Utilities, received the 811 ticket generated for the bridge-repair project on July 22. He went to the project site on July 23 to locate and mark any underground lines. While Deese was at the site, he saw a bridge, but there was no equipment present and no one was working. Locating no underground utilities owned or operated by Riviera Utilities at the bridge-repair project site, Deese did not mark anything regarding underground *1277 utilities or note the presence of the overhead power lines.
At the time of the accident causing Charles's injuries, DeBell was Riviera Utilities' general manager and CEO, Wallace was its operations manager, Saucier was its risk manager, and Tomlin was its superintendent of safety and training. DeBell worked at Riviera Utilities since 1989. Wallace had been the operations manager at Riviera Utilities since 2010, supervising all five operating divisions of Riviera Utilities-gas, water, electric, wastewater treatment, cable TV, and safety. Saucier had worked at Riviera Utilities since October 2012; the line-locate technicians employed by Riviera Utilities work in the risk and safety department under Saucier's supervision. Tomlin worked at Riviera Utilities from 2009 through the end of 2015. He was a superintendent whose responsibilities were storage, warehousing and inventory, and safety.
On July 31, 2014, Charles was employed by Gulf Equipment on the bridge-repair project. Charles's co-employee, Randall Hayes, was operating a track hoe[1] to drive steel pilings into the ground when the track hoe and/or a steel piling came in contact with an uninsulated overhead electrical power line. The electrical current traveled from the track hoe and/or piling into the body of the track hoe while Charles was touching the body of the track hoe, causing the electrical charge to enter into his hand, travel through his body, and exit via his leg. Charles was permanently disabled by the electrocution injuries he suffered, including a brain injury and memory loss.
The Hilburns sued Riviera Utilities and the Riviera employees in their individual capacities. In the complaint as last amended, the Hilburns alleged:
"22. Prior to July 31, 2014, Riviera [Utilities] and the [Riviera employees] received actual or constructive notice that bridge construction was about to occur on County Road 52 in Baldwin County, Alabama, and that [Charles's] employer, Gulf Equipment Corporation, would be performing the bridge construction.
"23. Riviera [Utilities] and the [Riviera employees] received actual or constructive notice from Alabama [811] on July 22, 2014, that Gulf Equipment Corporation would be performing bridge construction on County Road 52 in Baldwin County, Alabama.
"24. Riviera [Utilities] and the [Riviera employees] received actual or constructive notice that bridge construction was being performed on County Road 52 in Baldwin County, Alabama, when, based upon information and belief, Riviera [Utilities] trucks owned and operated by Riviera [Utilities] drove upon the construction site and observed the construction activities at or near Riviera [Utilities'] uninsulated, energized lines.
"25. Riviera [Utilities] and the [Riviera employees] reasonably anticipated that Gulf Equipment Corporation employees working at the bridge-construction site may come in contact with Riviera [Utilities'] uninsulated, energized power lines."
The Hilburns then asserted claims alleging that Riviera Utilities and the Riviera employees acted negligently and wantonly:
"a. By not insulating the power lines at the bridge-construction site.
"b. By not de-energizing the power lines at the bridge-construction site.
"c. By not re-routing the power lines at the bridge-construction site so the workers engaged in the bridge construction *1278 would not come in contact with them.
"d. By not employing fuses or circuit breakers that could immediately de-energize the power lines at the bridge-construction site if they came in contact with people or foreign objects."
The Hilburns alleged that the Riviera employees were "acting within the line and scope of their capacity as agents, servants, or employees of Riviera" Utilities at the time of the accident and that they were "responsible for taking and/or implementing appropriate safety measures when Riviera [Utilities] had actual or constructive notice that persons may come in contact with its uninsulated, energized power lines." The Hilburns also asserted a loss-of-consortium claim on behalf of Christa.
Riviera Utilities and the Riviera employees answered, asserting, among other defenses, discretionary-function immunity, substantive immunity, State-agent immunity, municipal immunity, sovereign immunity, qualified immunity, and absolute immunity. The Hilburns filed a motion for a partial summary judgment as to certain affirmative defenses raised by the Riviera employees asserting "statutory caps on damages and various forms of immunity" or, in the alternative, to strike those defenses. Riviera Utilities and the Riviera employees then filed a motion for a summary judgment as to all of the Hilburns' claims. In responding to that summary-judgment motion, the Hilburns stated that they did not oppose the entry of a summary judgment in favor of DeBell, Wallace, and Tomlin or the entry of a summary judgment in favor of Saucier as to the wantonness claim against him. The Hilburns argued, however, that Saucier was not entitled to a summary judgment as to the negligence claim against him. Moreover, they argued, Riviera Utilities was not entitled to a summary judgment in its favor. Nevertheless, after the trial court heard oral argument, it denied both summary-judgment motions as to all claims. Riviera Utilities and the Riviera employees then filed this petition for a writ of mandamus.
II. Standard of Review
" ' "While the general rule is that the denial of a motion for summary judgment is not reviewable, the exception is that the denial of a motion grounded on a claim of immunity is reviewable by petition for writ of mandamus. Ex parte Purvis, 689 So.2d 794 (Ala. 1996)....
" ' "Summary judgment is appropriate only when 'there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law.' Rule 56(c)(3), Ala. R. Civ. P., Young v. La Quinta Inns, Inc., 682 So.2d 402 (Ala. 1996). A court considering a motion for summary judgment will view the record in the light most favorable to the nonmoving party, Hurst v. Alabama Power Co., 675 So.2d 397 (Ala. 1996), Fuqua v. Ingersoll-Rand Co., 591 So.2d 486 (Ala. 1991) ; will accord the nonmoving party all reasonable favorable inferences from the evidence, Fuqua, supra, Aldridge v. Valley Steel Constr., Inc., 603 So.2d 981 (Ala. 1992) ; and will resolve all reasonable doubts against the moving party, Hurst, supra, Ex parte Brislin, 719 So.2d 185 (Ala. 1998).
" ' "An appellate court reviewing a ruling on a motion for summary judgment will, de novo, apply these same standards applicable in the trial court. Fuqua, supra, Brislin, supra. Likewise, the appellate court will consider only that factual material available of record to the trial court for its consideration in deciding the motion.
*1279 Dynasty Corp. v. Alpha Resins Corp., 577 So.2d 1278 (Ala. 1991), Boland v. Fort Rucker Nat'l Bank, 599 So.2d 595 (Ala. 1992), Rowe v. Isbell, 599 So.2d 35 (Ala. 1992)." '
" Ex parte Turner, 840 So.2d 132, 135 (Ala. 2002) (quoting Ex parte Rizk, 791 So.2d 911, 912-13 (Ala. 2000) ). A writ of mandamus is an extraordinary remedy available only when the petitioner can demonstrate: ' "(1) a clear legal right to the order sought; (2) an imperative duty upon the respondent to perform, accompanied by a refusal to do so; (3) the lack of another adequate remedy; and (4) the properly invoked jurisdiction of the court." ' Ex parte Nall, 879 So.2d 541, 543 (Ala. 2003) (quoting Ex parte BOC Group, Inc., 823 So.2d 1270, 1272 (Ala. 2001) )."
Ex parte Yancey, 8 So.3d 299, 303-04 (Ala. 2008).
III. Analysis
A. Wantonness claims asserted against the Riviera employees
Based on the concessions in the Hilburns' response in the trial court to the Riviera employees' summary-judgment motion and their responsive brief in this Court, we conclude that there is no genuine issue as to any material fact concerning the wantonness claims against the Riviera employees and that the Riviera employees are entitled to a summary judgment as to those claims. Their petition for a writ of mandamus as to the wantonness claims asserted against them is due to be granted.
B. Negligence claims asserted against the Riviera employees
As to DeBell, Tomlin, and Wallace, based on the concessions in the Hilburns' response to the Riviera employees' summary-judgment motion in the trial court and their responsive brief in this Court, we conclude that there is no genuine issue as to any material fact concerning the negligence claims asserted against DeBell, Tomlin, and Wallace and that those employees are entitled to a summary judgment as to the negligence claims against them. Their petition for a writ of mandamus as to the negligence claims against them is due to be granted.
As to Saucier, however, the Hilburns do not concede that he is entitled to a summary judgment as to their negligence claim against him. We therefore address Saucier's argument that he is entitled to State-agent immunity and to a summary judgment in his favor as to the Hilburns' negligence claim.
In Ex parte Cranman, 792 So.2d 392 (Ala. 2000), a plurality opinion, this Court formulated a test for immunity referred to as State-agent immunity. A majority of this Court subsequently adopted the Cranman test in Ex parte Butts, 775 So.2d 173, 178 (Ala. 2000). This Court extended State-agent immunity to municipal employees in City of Birmingham v. Brown, 969 So.2d 910, 916 (Ala. 2007). The standard for State-agent immunity as stated in Cranman is as follows:
"A State agent shall be immune from civil liability in his or her personal capacity when the conduct made the basis of the claim against the agent is based upon the agent's
"(1) formulating plans, policies, or designs; or
"(2) exercising his or her judgment in the administration of a department or agency of government, including, but not limited to, examples such as:
"(a) making administrative adjudications;
"(b) allocating resources;
"(c) negotiating contracts;
*1280 "(d) hiring, firing, transferring, assigning, or supervising personnel; or
"(3) discharging duties imposed on a department or agency by statute, rule, or regulation, insofar as the statute, rule, or regulation prescribes the manner for performing the duties and the State agent performs the duties in that manner; or
"(4) exercising judgment in the enforcement of the criminal laws of the State, including, but not limited to, law-enforcement officers' arresting or attempting to arrest persons; or
"(5) exercising judgment in the discharge of duties imposed by statute, rule, or regulation in releasing prisoners, counseling or releasing persons of unsound mind, or educating students.
"Notwithstanding anything to the contrary in the foregoing statement of the rule, a State agent shall not be immune from civil liability in his or her personal capacity
"(1) when the Constitution or laws of the United States, or the Constitution of this State, or laws, rules, or regulations of this State enacted or promulgated for the purpose of regulating the activities of a governmental agency require otherwise; or
"(2) when the State agent acts willfully, maliciously, fraudulently, in bad faith, beyond his or her authority, or under a mistaken interpretation of the law."
792 So.2d at 405.
This Court has established a "burden-shifting" process when a party raises the defense of State-agent immunity. Ex parte Estate of Reynolds, 946 So.2d 450, 452 (Ala. 2006). A defendant asserting State-agent immunity "bears the burden of demonstrating that the plaintiff's claims arise from a function that would entitle the State agent to immunity." Id. If the State agent makes such a showing, the burden then shifts to the plaintiff to show that one of the exceptions to State-agent immunity recognized in Cranman is applicable. Ex parte Kennedy, 992 So.2d 1276, 1282 (Ala. 2008).
In their motion for a summary judgment based on State-agent immunity, the Riviera employees set forth facts they considered sufficient to establish such immunity. The evidence applicable to Saucier, viewed in the light most favorable to the Hilburns, the nonmovants, see Ex parte Price, 256 So.3d 1184 (Ala. 2018), reveals the following facts.
The Hilburns' claims against Saucier are based on the 811 ticket submitted by Gulf Equipment that noted "bridge construction" would be performed during the bridge-repair project on County Road 52. Wallace, the operations manager of Riviera Utilities, testified in his deposition that the line-locate ticket-the 811 ticket-alerted Riviera Utilities to the risk of harm resulting from the proximity of construction equipment to uninsulated electrical wires above the construction site and that Riviera Utilities should have de-energized them or insulated them. Tomlin, who was Riviera Utilities' superintendent of safety and training during the period pertinent to this case, testified in his deposition that the line-locate ticket alerted Riviera Utilities to the risk of harm resulting from the proximity of construction equipment to uninsulated electrical wires above the construction site. He also testified that had he seen the line-locate ticket he would have taken steps to see that that risk was eliminated.
Saucier testified in his deposition that he disagreed with the conclusions as to what Riviera Utilities should have learned from an examination of the 811 ticket, but that factual dispute is not dispositive of the *1281 threshold issue whether Saucier has established a prima facie case of State-agent immunity.
The operative facts relevant to this analysis stem from the undisputed fact that Saucier never saw the 811 ticket before the accident that is the basis of this claim. Riviera Utilities, and specifically Saucier's department, did not have any policy or procedure that provided any specific direction to Saucier for supervising line-locate technicians, nor was there a protocol for making further inquiry of the contractor as to the necessity for deactivating overhead wires when notice was received of an impending underground excavation.
The Hilburns contend that whether Riviera Utilities had any such policy or procedure for review of 811 tickets is irrelevant because, they maintain, the information concerning the hazard presented by the bridge-repair project was apparent on the face of the 811 ticket. The Hilburns acknowledge that Saucier did not have actual knowledge of the hazard, but they contend that Deese's knowledge that the 811 ticket stated that "bridge construction" would be taking place, combined with the evidence indicating that other Riviera Utilities employees had experience with job-hazard analysis in bridge-construction scenarios, provided Saucier with constructive knowledge of a potential hazard at the bridge-construction site. If Saucier had constructive knowledge of the impending bridge construction and his job responsibilities included safety precautions regarding overhead power lines, the Hilburns argue, he owed a duty to Charles that allowed no exercise of judgment or discretion; therefore, they insist, there can be no State-agent immunity. On the other hand, the Hilburns argue, if Saucier had no notice of the danger, either actual or constructive, or his job responsibilities did not include safety precautions as to overhead power lines, a view they say is contrary to the evidence, they concede he would have no duty to Charles and hence no liability for that reason. The Hilburns argue that issues of fact as to Saucier's notice of the danger and his job responsibilities preclude the entry of a summary judgment as to their negligence claim against him. Therefore, the Hilburns argue, Saucier is either not liable to the Hilburns because he owed Charles no duty or he is liable and has no immunity.
In the context of review by mandamus of claims subject to a defense of State-agent immunity pursuant to Ex parte Cranman, supra, we first review the facts surrounding the activities of the agent. If those facts support immunity and the burden therefore shifts to the claimant, we review any facts offered to establish an exception to immunity as prescribed in Cranman to determine whether that exception is supported by substantial evidence. Ex parte Price, supra.
As the head of Riviera Utilities' risk and safety department, Saucier testified that his responsibilities are detailed in Riviera Utilities' written position description for that job. Item number 4 in the section of the position description titled "Essential Duties and Responsibilities" states that the risk manager
"[i]nspects and observes equipment, facilities, and work habits of field crews to detect existing or potential accident and health hazards. Responds to complaints of unsafe conditions and evaluates the conditions. Recommends corrective or preventative measures where indicated, develops new policies and protocols to address issues, and coordinates with employees and supervisors to find solutions."
Item number 11 of that section states that the risk manager "[s]upervises and oversees *1282 the daily operations of the Line Locate Department."
The line-locate technicians are also supervised by Riviera Utilities' compliance and risk supervisor, Jacqueline McClinton, who works in Saucier's department and whose position description includes monitoring line-locate notifications. Saucier, McClinton, and the line-locate technicians have access to the 811 ticket information; however, as previously noted, Riviera Utilities receives thousands of 811 tickets every year. The operative evidence for determining State-agent immunity deals with Saucier's activities relative to his activities as a State agent, and not with the merits of the Hilburns' underlying tort claim. We must first determine, therefore, whether acting without any policy or procedure that provided for supervising line-locate technicians or a protocol for making further inquiry of the contractor as to the necessity for deactivating overhead wires when notice was received of an impending underground excavation constituted activity on Saucier's part, as head of the risk and safety department, that falls outside the parameters established for immunity in Cranman.
Put another way, the inquiry turns on whether the facts associated with Saucier's management of his department in a manner that failed to prevent the accident made the basis of this claim deprive him of the immunity afforded under Cranman. As previously noted, "[a] State agent shall be immune from civil liability in his or her personal capacity when the conduct made the basis of the claim against the agent is based upon" a State agent's "formulating plans, policies, or designs" or "exercising his or her judgment in the administration of a department or agency of government, including, but not limited to ... allocating resources ... [and] supervising personnel." Cranman, 792 So.2d at 405.
It is undisputed that Deese was the only employee of Riviera Utilities who actually saw the 811 ticket at issue here, that he perceived no hazard from the wording of the ticket or from his visit to the construction site, and that he did not bring the ticket to the attention of any of his supervisors or anyone else at Riviera Utilities. Deese is not a defendant; therefore, the availability of immunity for his actions is not before us.
In light of the thousands of 811 tickets submitted annually, Saucier's failure to manage his department in a manner that would have enabled him to prevent the incident made the basis of this action falls squarely within the immunity from liability for actions based upon a State agent's formulating plans, policies, or designs or exercising his or her judgment in the administration of a department or agency of government, including, but not limited to, allocating resources and hiring and supervising personnel. That Saucier may have had constructive notice, as the Hilburns urge, is a factor that could be of critical importance in a proceeding against an employee of an entity not entitled to immunity, such as a private utility, but is not determinative in this proceeding where the issue is the employee's entitlement to immunity.
State-agent immunity under Cranman having been established, the burden then shifted to the Hilburns "to show, by substantial evidence, that one of the two exceptions to State-agent immunity recognized in Cranman applies." Ex parte Price, 256 So.3d at 1191 (emphasis added).[2] See *1283 also Ex parte City of Homewood, 231 So.3d 1082, 1088 (Ala. 2017) ("Because the materials submitted by the officers established that they qualified for immunity, the burden then shifted to Mines to show that one of the two Cranman exceptions to immunity applied."). The only possible exception here deals with the merits of the claim as they apply to whether the State agent acted "willfully, maliciously, fraudulently, in bad faith, beyond his or her authority, or under a mistaken interpretation of the law." Cranman, 792 So.2d at 405.
We turn, therefore, to the Hilburns' contention that State-agent immunity is not available to Saucier as to their negligence claim against him. The Hilburns contend that Saucier cannot be immune because, they say, he disregarded his duty to Charles and, in doing so, acted beyond his authority or under a mistaken interpretation of the law and that, therefore, he forfeited his State-agent immunity.[3]
We see no substantial evidence here that Saucier exceeded his authority or that he acted under a mistaken interpretation of law. His discharge of his duties as head of the risk and safety department fall well within the parameters of the authority conferred on him. The allegation of the commission of a tort was once viewed as evidence of action in excess of authority. See Elmore v. Fields, 153 Ala. 345, 351, 45 So. 66, 67 (1907), in which this Court found immunity unavailable to the State agent in his individual capacity and observed that "the authorities hold that [a State agent] has no authority to act for the state in the commission of a tort." This view no longer prevails. In Taylor v. Shoemaker, 605 So.2d 828 (Ala. 1992), cited with approval in Cranman, the Court noted that the holding in Elmore v. Fields that the commission of a tort constituted acting beyond authority had subsequently been very clearly rejected. Moreover, there is no evidence indicating that Saucier relied on a mistaken interpretation of state law simply because the Hilburns alleged that he was guilty of an unintentional tort in the discharge of his duties as a State agent.
Saucier has demonstrated that he has "(1) a clear legal right to the order sought; (2) an imperative duty upon the respondent to perform, accompanied by a refusal to do so; (3) the lack of another adequate remedy; and (4) the properly invoked jurisdiction of the court." BOC Group, 823 So.2d at 1272. Therefore, his motion for a summary judgment as to the Hilburns' negligence claim asserted against him was due to be granted on the basis of State-agent immunity.[4]
C. Claims asserted against Riviera Utilities
Riviera Utilities argues that, as a municipal utility, it is a government *1284 entity entitled to substantive immunity. Substantive immunity shields a municipality from liability for the negligent acts of its employees "in those narrow areas of governmental activities essential to the well-being of the governed, where the imposition of liability can be reasonably calculated to materially thwart [a municipality's] legitimate efforts to provide such public services." Rich v. City of Mobile, 410 So.2d 385, 387 (Ala. 1982). The substantive-immunity rule is given effect in the context of "those public service activities of governmental entities ... so laden with the public interest as to outweigh the incidental duty to individual citizens." Id. at 387-88. Riviera Utilities contends that because it provides utility services to the public, the substantive-immunity rule applies here. Moreover, it argues, its participation in the 811 ticket program is a benefit to itself and to the public.
The Hilburns argue that Riviera Utilities has not demonstrated that it is entitled to substantive immunity. "[T]he lack of anything other than an incidental duty to a particular individual prevents the municipality from being liable from damages, because a breach of a duty owed to the general public will not form the basis for a negligence claim by an individual citizen." Bill Salter Advertising, Inc. v. City of Atmore, 79 So.3d 646, 652 (Ala. Civ. App. 2010). In this case, the Hilburns argue, Riviera Utilities did not owe a duty to the general public, but to the employees of Gulf Equipment Corporation who were working on the bridge-repair project in close proximity to Riviera Utilities' overhead power lines. According to the Hilburns, the safety measures they allege Riviera Utilities should have implemented would not have been directed toward the general public, but only toward the Gulf Equipment employees working on the bridge-repair project.
We conclude that, because the Hilburns' claims against Riviera Utilities did not involve actions that took place within the city limits of Foley, Riviera Utilities clearly is not entitled to substantive immunity. The cases cited by Riviera Utilities are distinguishable. See, e.g., Rich v. City of Mobile, in which this Court found the municipality immune from claims alleging negligent inspection by city plumbing inspectors checking an individual residence in the city for compliance with the city's plumbing code, and Bill Salter Advertising, Inc. v. City of Atmore, 79 So.3d 646, 653 (Ala. Civ. App. 2010), in which the Court of Civil Appeals held that enactment of a sign ordinance for the benefit of the citizens of the municipality is a municipal function giving rise to substantive immunity and that an employee enforcing the ordinance shares in that immunity, following Tutwiler Drug Co. v. City of Birmingham, 418 So.2d 102, 105 (Ala. 1982). We note, however, that the unavailability of substantive immunity for Riviera Utilities does not foreclose the availability to it of any defense based upon § 11-93-2, Ala. Code 1975, the statutory cap on damages afforded a governmental entity. This defense has been asserted by Riviera Utilities in the trial court and will be addressed in further proceedings in the trial court. Because Riviera Utilities is not entitled to a summary judgment on the basis of substantive immunity, the trial court properly denied its motion for a summary judgment on this basis.
IV. Conclusion
Because the Hilburns concede that the Riviera employees are entitled to a summary judgment as to the wantonness claims asserted against them and that DeBell, Wallace, and Tomlin are entitled to a summary judgment as to the negligence claims asserted against them, they have established a clear legal right to a summary *1285 judgment on those claims. Because Saucier has demonstrated that he is entitled to State-agent immunity as to the negligence claim asserted against him, he has established a clear legal right to a summary judgment on that claim. However, because Riviera Utilities has not demonstrated that it is entitled to substantive immunity as to the claims asserted against it, it has not established a clear legal right to a summary judgment on those claims. Therefore, we grant the petition only as to the Riviera employees and issue a writ directing the Baldwin Circuit Court to vacate its order of August 29, 2017, denying a summary judgment as to the Riviera employees and to enter a summary judgment in favor of DeBell, Wallace, Tomlin, and Saucier as to the claims asserted against them. We deny the petition as to Riviera Utilities.
PETITION GRANTED IN PART AND DENIED IN PART; WRIT ISSUED.
Champ Lyons, Jr., Special Chief Justice, and Pamela Baschab, Jean Williams Brown, Robert Bernard Harwood, Jr., Gorman Houston, and Thomas A. Woodall, Special Justices, concur.*
Terry L. Butts, Special Justice, concurs in the result in part and dissents in part.
TERRY L. BUTTS, Special Justice (concurring in the result in part and dissenting in part).
As to Tom DeBell, James Wallace, and Roby Tomlin, I concur in the result of granting the petition for a writ of mandamus as to all claims against them on the basis of State-agent immunity.
As to Kevin Saucier, I concur in the result only in granting the petition for a writ of mandamus on the wantonness claim against him because the Hilburns do not oppose it. As to granting the petition for the writ of mandamus on the negligence claim against Saucier, however, I dissent. I would deny the petition as to that negligence claim and allow the trial court to address that issue going forward. Ex parte Cooper Tire & Rubber Co., 987 So.2d 1090, 1101 (Ala. 2007) (noting that this Court is "aware of the fundamental disinclination of the appellate courts to intrude into the trial court's province in conducting the litigation process"); Ex parte Franklin Cty. Dep't of Human Res., 674 So.2d 1277, 1280 (Ala. 1996) ("Fact-driven immunity questions should be first decided in the trial court, with a developed record.").
As to Riviera Utilities, I concur in the result as to denying the petition for a writ of mandamus as to all claims asserted against it.

A track hoe is a piece of heavy construction equipment similar to a backhoe.

Because the trial court denied the motions for a summary judgment without explanation, we can only speculate as to whether it found immunity and then deemed an exception applicable or simply found no basis for immunity for Saucier.

The Hilburns do not assert any exception based upon willful, malicious, fraudulent, or bad-faith conduct. Indeed, as previously noted, the Hilburns conceded below and in this Court that their wantonness claim against Saucier, requiring a lesser degree of culpability than the conduct involved in the aforementioned exceptions, was due to be dismissed.

"Mandamus review of the denial of a summary-judgment motion 'grounded on a claim of immunity' is an exception to the general rule against interlocutory review of the denial of summary-judgment motions. Ex parte Auburn Univ., 6 So.3d 478, 483 (Ala. 2008) ; Ex parte Hudson, 866 So.2d 1115, 1120 (Ala. 2003). In those exceptional cases, '[w]e confine our interlocutory review to matters germane to the issue of immunity. Matters relevant to the merits of the underlying tort claim, such as issues of duty or causation, [we leave] to the trial court....' 866 So.2d at 1120."
Ex parte Simpson, 36 So.3d 15, 22 (Ala. 2009) ; see also Ex parte Monroe Cty. Bd. of Educ., 48 So.3d 621, 628 n.2 (Ala. 2010).

Note from the reporter of decisions: Canon 3.C of the Canons of Judicial Ethics requires a Justice to disqualify himself or herself in any proceeding in which the Justice's impartiality might reasonably be questioned. On January 11, 2018, the Chief Justice and Associate Justices recused themselves from consideration of this case. Pursuant to § 149, Ala. Const. 1901, the following former Associate Justices and Appellate Judges were appointed to serve as the special Supreme Court in this case: Champ Lyons, Jr., Pamela Baschab, Jean Williams Brown, Terry L. Butts, R. Bernard Harwood, Jr., Gorman Houston, and Thomas A. Woodall.